**Ronald E. McCASKILL and Leander McCary, Plaintiffs-Intervenors,**

v.

**TEXACO, INC., Defendant.**

**Civ. A. No. 6281-70.**

United States District Court,
S. D. Alabama, S. D.

Nov. 20, 1972.

William H. Saliba, Mobile, Ala., for plaintiffs-intervenors.

David W. Green & Sidney H. Schell, Mobile, Ala., and William C. Weitzel and Charles F. Kazlauskas, Jr., Legal Dept., Texaco, Inc., New York City, for defendant.

HAND, District Judge.

## INTRODUCTION

This is an antitrust action commenced against Texaco Inc. ("Texaco") on September 25, 1970 by two former Texaco dealers. On March 16, 1971, five additional former Texaco dealers intervened as plaintiffs, and, thereafter, on June 1, 1971, plaintiffs Leander McCary ("McCary") and Ronald E. McCaskill ("McCaskill") and McCaskill's former wife, Ivy McCary, also former Texaco dealers, intervened. The first seven of the above plaintiffs were represented by Charles Erwin, Esq. The last three plaintiffs, McCary, McCaskill and Ivy McCary were and are represented by William H. Saliba, Esq.

On April 29, 1972, plaintiff Ivy McCary was stricken as a party plaintiff for failure to file answers or objections to Texaco's interrogatories. On May 10, 1972, all of the remaining plaintiffs, except McCary and McCaskill, entered into stipulations voluntarily dismissing the action with prejudice. Accordingly, there are now two plaintiffs remaining in the action, McCary and McCaskill, against whom the present motion is directed.

At the outset, the Court feels that it would be appropriate to recite certain aspects of the procedural background of this action.

1. On January 4, 1972, Texaco filed and served separate sets of interrogatories directed to plaintiff Ronald E. McCaskill, plaintiff Leander McCary and plaintiff Ivy McCary. (As indicated above, plaintiff Ivy McCary was later ordered stricken as a party plaintiff by reason of her failure to file answers or objections to these interrogatories.) None of these plaintiffs answered, objected or otherwise responded to these interrogatories within the time provided by the Federal Rules of Civil Procedure.

2. Thereafter, on February 8, 1972, all three plaintiffs filed identical motions seeking to have said interrogatories stricken. None of these moving parties submitted briefs, memoranda or any other papers in support of these motions nor did any of them or their counsel even appear at the hearing of these motions on February 17, 1972.

3. On March 1, 1972, this Court overruled said motions and ordered the three plaintiffs to file answers to the aforesaid interrogatories within fifteen days. Said March 1, 1972 Order further expressly provided that any plaintiffs' failure to do so would subject him "to suffer a dismissal of the cause as to that plaintiff or such other penalty or penalties as the law provides."

4. Evasive and incomplete answers were filed on behalf of plaintiffs McCaskill and McCary on March 13, 1972 and March 14, 1972, respectively. No

answers were filed on behalf of Ivy McCary. On defendant's motion to dismiss, this Court, on April 29, 1972, ruled as follows:

"The records of this court show that IVY McCARY has failed to file her answer or objections to the interrogatories and to comply with the order of this Court dated March 1, 1972.

"It is, therefore, the ORDER of this Court that IVY McCARY be and she hereby is STRICKEN as a party plaintiff to this cause of action.

"It is the opinion of the Court that the answers of LEANDER McCARY to the said interrogatories are evasive or incomplete and, therefore, are considered a failure to answer the interrogatories as required by Rule 33 F. R.CIV.P.

"RONALD E. McCASKILL has attempted to answer the interrogatories simply by adopting the answers as filed by LEANDER McCARY. The Court considers this adoption a complete failure bordering on a willful failure to answer the interrogatories as required by Rule 33 F.R.CIV.P. and, therefore, the answers will not be accepted by the Court.

"LEANDER McCARY and RONALD E. McCASKILL are hereby ordered to file in this court within ten (10) days from the date of this order complete, full and informative answers to the interrogatories heretofore propounded to them by the defendant. Failure to comply with this order will be sufficient grounds for the court on its own motion to strike such party as a party plaintiff in this action."

5.  On May 9, 1972, further purported answers to defendant's interrogatories were served by plaintiffs McCaskill and McCary and supplemental purported answers of plaintiff McCary were served on May 19, 1972.

6.  On June 2, 1972, defendant filed a motion, pursuant to Rule 37(b) of the Federal Rules of Civil Procedure, for an order dismissing the action on the ground that plaintiffs' latest purported answers to defendant's interrogatories were a sham, evasive and insufficient and constituted a willful failure to comply with this Court's Order of April 29, 1972.

7.  This Court held a pretrial hearing on this matter on July 10, 1972, and during that hearing reviewed the purported answers served by plaintiffs. This Court found that the purported answers of plaintiffs were again substantially deficient, but again allowed plaintiffs an opportunity to file full and complete answers, allowing plaintiffs until July 31, to do so.

8.  On July 28, 1972, plaintiffs filed their third purported set of answers to defendant's interrogatories. Once again, in contravention of this Court's April 29, 1972 Order, plaintiffs filed a single set of answers for both plaintiffs. In addition, the purported answers were unsigned and unsworn to by either party, and in violation of the specific direction of this Court at the July 10, 1972 hearing, the purported answers failed to set out the specific interrogatories being answered. Accordingly, the purported answers were not answers at all. Moreover, plaintiffs simply failed to answer a number of interrogatories and as to those which they purported to answer, the answers were deficient.

9.  By September 18, 1972, plaintiffs had not yet filed answers to those interrogatories which they had failed to answer by July 31, 1972, the date fixed by this Court at the July 10, 1972 hearing for plaintiffs' answers to be filed. Significantly, plaintiffs had not even sought any extension from this Court for additional time. Moreover, plaintiffs had taken no steps to remedy the deficiencies in the answers of July 28, 1972. Accordingly, on September 18, 1972, this Court addressed a letter to plaintiffs' counsel directing that plaintiffs supply full and complete answers, in accordance with the Court's previous orders, no later than October 2, 1972.

10.  Finally, on September 29, 1972 and September 30, 1972, respectively,

plaintiff McCaskill and plaintiff McCary each served their fourth set of answers to defendant's interrogatories.

11. Confronted with the difficulty of obtaining from plaintiffs sufficient answers to defendant's interrogatories, this Court made a diligent effort to obtain from plaintiffs a meaningful pretrial order, defining the precise issues of this case and setting out the specific claims asserted by plaintiffs for money damages and plaintiffs' computations thereof.

12. Despite the Court's efforts in attempting to prepare a meaningful pretrial order, plaintiffs continued their practice of evading this Court's orders and refusing to provide sufficient information upon which to base a pretrial order. Thus, this Court was required to state at the pretrial hearing held on July 10, 1972:

> "What I am saying is that this court has not been helped by any pre-trial conference that we have held in trying to delimit the issues and define what they are so as to be in a position to rule on matters of evidence and to rule on matters of law and that is the purpose of the pre-trial conference and it is specifically set forth in the order of this court that it will be done in that fashion and you will not walk into that courtroom and sit down there with a bowl full of tossed green salad and pull out chunks from time to time before the jury in hopes of making a prima facie case. We are not going to try the case that way.

> "It is going to be spelled out in accordance with the court's pre-trial order. You are going to set out the conspiracy, who was involved and so forth or we are not going to trial." (Transcript of Pre-trial Hearing, July 10, 1972, pp. 20–21).

13. Finally, after this Court had futilely attempted, on five separate occasions, to set and conduct a meaningful pretrial conference, this Court on August 16, 1972, entered an order that plaintiffs answer a Legal Questionnaire,

prepared by this Court, in a final attempt to define the issues of the case and to specify plaintiffs' specific claims for money damages. Plaintiffs were allowed until September 15, 1972, to file their responses, and on that date they filed their Answer to Legal Questionnaire. It is on the basis of the specific claims for money damages alleged by plaintiffs in their Answers to Texaco's Interrogatories and in their Answers to Legal Questionnaire (Plaintiffs' Answer to Texaco Interrogatory 21, Plaintiffs' Answer to Legal Questionnaire II.4; see also Plaintiffs' Answer to Texaco Interrogatory 16 and plaintiffs' Answer to Legal Questionnaire I.11), that this Court now defines the specific claims of plaintiffs and the issues presented thereby. Plaintiffs assert two claims. The first is a claim under Section 2(a) of the Robinson-Patman Act, 15 U.S.C. Section 13(a), for damages arising out of Texaco's alleged price discrimination. The second is a claim under Section 1 of the Sherman Act, 15 U.S.C., Section 1, for damages in the form of an overcharge to Plaintiffs arising out of Texaco's alleged participation in a horizontal conspiracy to fix prices. This Court finds that plaintiffs have had ample opportunity, far and above that to which a litigant would normally be entitled pursuant to the Federal Rules of Civil Procedure, to set forth and define their claims.

## FINDINGS OF FACT

The Court hereby makes the following Findings of Fact on the basis of the affidavits of R. F. Walding, sworn to November 3, 1972, C. H. Rush, sworn to October 24, 1972 and A. J. Suraci, sworn to October 13, 1972, submitted by Texaco in support of this motion. Plaintiffs have submitted no opposing affidavits, nor have they submitted any other material provided for in Rule 56(e) of the Federal Rules of Civil Procedure sufficient to create any genuine issue of material fact. Moreover, defendant furnished the Court affidavits from several witnesses which plaintiffs had listed in

a pre-trial agreement that would testify to a conspiracy. Such affidavits completely contravene plaintiffs' contentions.

Further, plaintiffs have failed to set forth any reason whatsoever as to why they have been unable to obtain any affidavits in opposition to this motion and they have sought no extension of time from this Court in order to obtain any affidavits. Indeed, even if plaintiffs had been unable to obtain affidavits, there is no reason why they could not have obtained such relevant testimony as might have been included in an affidavit "by taking . . . . . depositions, filing requests for admissions, or pursuing the other means provided in the Federal Rules of Civil Procedure." Maddox v. Aetna Casualty and Surety Company, 259 F.2d 51, 54 (5th Cir. 1958).

1. Texaco leased service stations located at 455 Azalea Road and Highway 90 near Azalea Road (both in Mobile, Alabama) to McCaskill. McCaskill operated the first location from approximately September 26, 1967 to approximately November 3, 1967 and the second location from approximately November 23, 1967 to approximately May 2, 1968. (Complaint in Intervention, ¶ I.3.)

2. Texaco leased a service station located at 3938 Government Boulevard, Mobile, Alabama to McCary from approximately January, 1968 to approximately February, 1969. (Complaint in Intervention, ¶ I.5.)

*Price Discrimination (Robinson-Patman Act)*

*M & A Corporation*

3. During all times relevant herein, M & A was an Alabama corporation located in Mobile, Alabama, engaged in the wholesale distribution of gasoline. (Affidavit of A. J. Suraci, sworn to October 13, 1972 [hereinafter "Suraci Affidavit"], ¶ 2; Affidavit of C. H. Rush, sworn to October 24, 1972 [hereinafter "Rush Affidavit"], ¶ 2).

4. From August 1, 1961 through approximately June 30, 1966, M & A's gasoline requirements were supplied by Continental Oil Company ("Conoco"). The prices paid by M & A for Conoco's gasoline were as follows: for house brand, Conoco's posted dealer tankwagon price less a discount of .0325 per gallon; for premium, Conoco's posted dealer tank-wagon price less a discount of .0375. (Suraci Affidavit, ¶ 4)

5. During the latter part of 1965 and early 1966, M & A negotiated with several gasoline suppliers relative to their gasoline requirements. (Suraci Affidavit ¶ 5) As a result of these negotiations, the following offers were made to M & A:

a. Conoco offered to continue the arrangement outlined in paragraph 4 above. (This offer resulted in net prices of .1315 and .1615, respectively, for house brand and premium gasolines.) In addition, M & A was to receive an additional discount of 1% for cash with respect to all purchases. (Suraci Affidavit, ¶ 5A)

b. Phillips Petroleum Company ("Phillips") offered to sell to M & A at discounts of .0325 off its posted dealer tankwagon price for house brand and .0375 off its posted dealer tankwagon price for premium. (This offer resulted in net prices of .1315 and .1615, respectively, for house brand and premium gasolines.) In addition, M & A was to receive an additional discount of 1% for cash with respect to all purchases. (Suraci Affidavit, ¶ 5B)

c. Sinclair Oil Company ("Sinclair") offered to sell to M & A at discounts of .135 off its posted dealer tankwagon prices for both house brand and premium. (This offer resulted in net prices of .1290 and .1640, respectively, for house brand and premium gasolines.) In addition, M & A was to receive an additional discount of 1% for cash with respect to all purchases. (Suraci Affidavit, ¶ 5C)

6. In April and May of 1966, M & A contacted Texaco and discussed the possibility of having Texaco supply M &

A's gasoline requirements. During these negotiations, M & A advised Texaco of the prices at which Conoco had been selling gasoline to them and of the competitive offers outlined in paragraphs 5a, b and c above. (Suraci Affidavit, ¶ 6; Rush Affidavit, ¶¶ 2, 3 and 4)

7. On the basis of the Conoco price to M & A and the competitive offers outlined in paragraphs 5a, b and c, Texaco offered discounts of .0325 off its posted dealer tankwagon price for house brand gasoline and .035 for premium. (This offer resulted in net prices of .1315 and .1640, respectively, for house brand and premium gasolines.) No allowance or discount was to be extended for cash. (Suraci Affidavit, ¶ 8; Rush Affidavit, ¶ 6)

8. The prices offered by Texaco to M & A as described in paragraph 7 above were in all cases higher than the price being paid by M & A to Conoco and the prices offered to M & A as described in paragraphs 5a, b and c above. (Suraci Affidavit, ¶¶ 5 and 8; Rush Affidavit, ¶¶ 2, 3, 4 and 6)

9. M & A continued to purchase its requirements from Texaco until approximately June 30, 1971. During this entire period, M & A was repeatedly advised by Conoco, Phillips and Sinclair, in an effort to obtain M & A's business, that the offers set forth in paragraphs 5a, b and c remained continuously available. Additionally, M & A was solicited by the Gulf Oil Company ("Gulf") which offered discounts of .035 off its posted dealer tankwagon price for house brand and premium. (Suraci Affidavit, ¶¶ 9 and 10)

10. The offers described in paragraph 9 above and their repeated renewals were communicated by M & A to Texaco with a view towards obtaining a more favorable price from Texaco. However, Texaco's prices during the entire period remained at discounts of .0325 for house brand and .035 for premium. (Suraci Affidavit, ¶ 11; Affidavit of R. F. Walding, sworn to November 3, 1972 [hereinafter "Walding Affidavit"], ¶¶ 3–8)

11. On approximately June 17, 1971, M & A ceased purchasing gasoline requirements from Texaco and commenced purchasing all its gasoline requirements from Gulf. The prices offered by Gulf were discounts of .035 for both house brand and premium. Additionally, Gulf gave M & A financial assistance in connection with the amortization of a $120,000 obligation of M & A. This Gulf offer was also communicated to Texaco which declined to meet it. (Suraci Affidavit, ¶ 11; Walding Affidavit, ¶¶ 7 and 8)

### Lula Roberts

12. Lula Roberts owned and operated a Texaco service station at 623 Holcombe Avenue, Mobile, Alabama. During the period that plaintiffs operated their service stations, Lula Roberts was approached by Humble Oil and Refining Company ("Humble") which offered her a discount of .025 off Humble's posted dealer tankwagon prices for premium and house brand. Mrs. Roberts communicated this offer to Texaco. After this communication to Texaco, Texaco granted Mrs. Roberts a discount of .02 off Texaco's dealer tankwagon prices for house brand and premium in order to retain this account. (Walding Affidavit, ¶ 10)

### J. J. McClendon

13. J. J. McClendon owned and operated a Texaco service station at 4671 Union Church Road in Mobile, Alabama. During the period that plaintiffs operated their service stations, J. J. McClendon was approached by Gulf which offered him a discount of .02 off Gulf's posted dealer tankwagon prices for premium and house brand. J. J. McClendon communicated this offer to Texaco. After this communication to Texaco, Texaco granted McClendon a discount of .02 off Texaco's dealer tankwagon prices for house brand and premium in order to retain this account. (Walding Affidavit, ¶ 11)

*Earl Jordan and Jim Luckey*

14. Earl Jordan and Jim Luckey were each charged the same price by Texaco for gasoline and all other products as were plaintiffs during the entire period that plaintiffs operated as Texaco dealers. (Walding Affidavit, ¶¶ 15 and 16)

15. During interim emergency periods when Texaco service stations closed for various reasons, Earl Jordan and Jim Luckey were, on occasion, engaged by Texaco to open and operate such closed Texaco service stations, and were paid $15 per day for performing this service. The reason for this arrangement was because Texaco continues to incur substantial overhead expenses with respect to a closed station, while receiving no offsetting income from the sale of Texaco products through that station. In addition, it has been Texaco's experience that a closed station is detrimental to its public image and that closed stations are frequently subject to vandalism and general deterioration. For the above reasons, where Texaco has not been able within a reasonable time to obtain a dealer to operate a closed station, Texaco has, on occasion, engaged Jordan or Luckey to do so under the above arrangement. (Walding Affidavit, ¶ 16)

16. The above compensation received by Jordan and Luckey obligated them to operate the station during all or a designated portion of the week, generally consisting of 7 or 6 days, for a designated number of hours per day, and further obligated them to provide personnel to operate the station in an efficient manner and to maintain the station in a neat and orderly condition. (*Id.*)

17. The above compensation received by Jordan and Luckey bore no relation whatever to and was in no way dependent upon the quantity of products which they purchased from Texaco. (*Id.*)

18. Neither Earl Jordan nor Jim Luckey received any discount whatever on their TBA purchases from Texaco and, thus, each paid precisely the same price as any other Texaco dealer, including plaintiffs, for any TBA item which they purchased for resale through any station which they owned or operated. (Walding Affidavit, ¶¶ 14 and 15)

19. During the period from December 1967 through the time plaintiff McCary ceased operating as a Texaco dealer, Jordan and Luckey functioned as supply points for Texaco for the delivery of Texaco TBA items to Texaco dealers in the Mobile area. (*Id.*)

20. Under their arrangement with Texaco, Jordan and Luckey delivered Texaco TBA items to other Texaco dealers and received a commission of 15% of the purchase price of each item they delivered, with the exception of tires upon which they received a flat $1 commission for each tire delivered. In addition, Luckey and Jordan were not permitted to receive in excess of $50 in commissions in any month. Jordan and Luckey were required by Texaco to maintain a full and balanced inventory of TBA items, in a quantity sufficient to meet other Texaco dealers' needs and were obligated to be equipped to deliver such TBA items to other Texaco dealers on an emergency basis as required. Both Jordan and Luckey did not receive any commission on any TBA items retailed through any service station in which either of them had any interest whatsoever, financial or otherwise. (*Id.*)

*Price Fixing (Sherman Act § 1)*

21. Plaintiffs have failed to come forward with significant probative evidence that Texaco was a party to or engaged in any contract, conspiracy or agreement with any oil company to fix or control the price of gasoline to dealers. (Walding Affidavit, ¶¶ 17–19)

CONCLUSIONS OF LAW

1. There is no genuine issue of material fact relating to the good faith meeting of competition defense under § 2(b) of the Robinson-Patman Act which Texaco relies upon as a ground for summary judgment.

■ 2. The affidavits submitted by Texaco in support of its motion for summary judgment incontrovertibly establish that Texaco's lower prices to M & A, Roberts and McClendon were granted in good faith to meet competition in compliance with § 2(b) of the Robinson-Patman Act.

■ 3. Texaco is entitled to judgment as a matter of law since § 2(b) of the Robinson-Patman Act provides a complete defense to plaintiffs' price discrimination claim alleged under § 2(a) of the Robinson-Patman Act. Standard Oil Co. (Indiana) v. FTC, 340 U.S. 231, 71 S.Ct. 240, 95 L.Ed. 239 (1951), Jones v. Borden Co., 430 F.2d 568 (5th Cir. 1970). A Section 2(b) defense is available to Texaco regardless of whether Texaco was seeking to retain or obtain a customer. Jones v. Borden Co., supra; Sunshine Biscuits, Inc. v. FTC, 306 F.2d 48 (7th Cir. 1962).

■ 4. Texaco's payments to Jordan and Luckey for their temporary operation of previously closed Texaco service stations and their service as supply points for the delivery of TBA items to other Texaco dealers were not discriminations in price between purchasers of commodities of like grade and quality within § 2(a) of the Robinson-Patman Act, but instead constituted compensation for services performed by Jordan and Luckey.

■ 5. Texaco has submitted evidence by way of affidavit unequivocally denying that it engaged in any conspiracy to fix or control prices to dealers. Plaintiffs' failure to offer "significant probative evidence" of any such conspiracy mandates that Texaco be awarded summary judgment with respect to this claim also. First National Bank of Arizona v. Cities Service Co., 391 U.S. 253, 289–290, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968). See also, Jones v. Borden Co., 430 F.2d 568 (5th Cir. 1970); Hiram Walker, Inc. v. A. & S. Tropical, Inc., 407 F.2d 4 (5th Cir. 1969), cert. den., 396 U.S. 901, 90 S.Ct. 212, 24 L.Ed.2d 177 (1969); Cal Distributing Co. v. Bay Distributors, Inc., 337 F.Supp. 1154 (M.D.Fla.1971); Bushie v. Stenocord Corp., 460 F.2d 116, 120 (9th Cir. 1972) ("As the Supreme Court made clear in First National Bank v. Cities Service, Inc., . . . allegations of restraint of trade must be supported by 'significant probative evidence' to overcome a motion for summary judgment."); Harris v. Louisiana State Supreme Court, 334 F.Supp. 1289, 1310 n. 37 (E.D.La.1971); Chapman v. Rudd Paint & Varnish Co., 409 F.2d 635 (9th Cir. 1969); McGuire v. Columbia Broadcasting System, Inc., 399 F.2d 902 (9th Cir. 1968); Daily Press, Inc. v. United Press International, 412 F.2d 126 (6th Cir. 1969), cert. den. 396 U.S. 990, 90 S.Ct. 480, 24 L.Ed.2d 453 (1969); Beckman v. Walter Kidde & Co., 316 F.Supp. 1321 (E.D.N.Y.1970), aff'd 451 F.2d 593 (2d Cir. 1971), cert. den. 408 U.S. 922, 92 S. Ct. 2488, 33 L.Ed.2d 333 (1972).

■ In addition, the Court notes that the bases upon which plaintiffs would have the jury determine and compute damages, as set forth in their responses to both the Court's Legal Questionnaire and defendant's interrogatories (Plaintiff's Answer to Texaco Interrogatory 21; Plaintiffs' Answer to Legal Questionnaire II.4; see also Plaintiffs' Answer to Texaco Interrogatory 16 and Plaintiffs' Answer to Legal Questionnaire I.11) (hereinafter referred to as "Plaintiffs' Responses") are totally inadequate. It is axiomatic that for a private plaintiff to recover under Section 4 of the Clayton Act (15 U.S.C. § 15) he must prove both that he was "injured in [his] business or property by reason" of defendant's violation of the antitrust laws and that he "sustained" measurable damages as a result. Keogh v. Chicago & Northwestern Rwy. Co., 260 U.S. 156, 165, 43 S.Ct. 47, 67 L.Ed. 183 (1922); Story Parchment Co. v. Peterson Parchment Paper Co., 282 U.S. 555, 562, 51 S.Ct. 248, 75 L.Ed. 544 (1931).

■ With respect to plaintiffs' claim for recovery based upon an alleged agreement to exchange price informa-

tion (and for these purposes, we assume *arguendo* the existence and illegality of such an agreement), plaintiffs proffer no evidence from which a jury could properly conclude that plaintiffs were injured in their business or property by virtue of the alleged agreement; nor any evidence from which the jury could rationally measure any plaintiff's damages. Indeed, Plaintiffs' Responses refer to no evidence showing that the claimed price exchange agreement had any impact whatever on prices. In place of evidence from which a jury might rationally determine that prices would have been lower and rationally assess the extent thereof, the approach taken by Plaintiffs' Responses is merely to give the jury the price at which Texaco sold to M & A, a licensed wholesale distributor, and ask the jury to infer, without more, that such price would have been the price to plaintiff lessee retailers but for the price exchange agreement. This calls for baseless and impermissible conjecture. The further steps in plaintiffs' theory of recovery—inviting sheer speculation as to whether plaintiffs' volume and/or profits would have skyrocketed predicated upon the unrealistic assumption that all other dealers would have acted contrary to their economic interests—accentuates the inadequacy of their case with respect to this critical element.

■ Plaintiffs' Responses in regard to their Robinson-Patman Act claim disclose a similar lack of evidentiary basis to satisfy the proximate injury and measurable damage requirements for that claim. As the Supreme Court emphasized in Perkins v. Standard Oil Co., 395 U.S. 642, 648, 89 S.Ct. 1871, 1874, 23 L. Ed.2d 599 (1969):

> "Before an injured party can recover damages under the [Robinson-Patman] Act, he must, of course, be able to show a causal connection between the price discrimination in violation of the Act and the injury suffered."

As the courts have long explained, this is obviously not satisfied by merely showing a price difference, particularly in the gasoline marketing context where the favored and disfavored purchasers are not the only ones in the marketplace to whom the ultimate consumer may turn. *E. g.* Enterprise Indus., Inc. v. Texas Co., 240 F.2d 457 (2d Cir.), cert. denied 353 U.S. 965, 77 S.Ct. 1049, 1 L. Ed.2d 914 (1957); Alexander v. Texas Co., 149 F.Supp. 37 (W.D.La.1957), 165 F.Supp. 53 (W.D.La.1958); Kidd v. Esso Standard Oil Co., 295 F.2d 497 (6th Cir. 1961).

■ Nevertheless, plaintiffs offer no evidence of proximate injury or damages but rely exclusively upon the mere alleged price difference. On this basis alone, they would have the jury infer that plaintiffs were somehow injured in the amount of the price difference. Indeed, they do not even claim that the alleged favored purchaser or purchasers did anything more with the purported price advantage than put it in their pockets. Patently, this does not satisfy the fundamental evidentiary requirements that would allow a jury to infer the requisite causal connection between the lower price to someone else and injury to plaintiffs' business or property.

■ Plaintiffs' alternative theory of Robinson-Patman Act recovery—that they were somehow injured in their business or property by reason of Texaco allegedly compensating others for the performance of various services not performed by plaintiffs and unrelated to the purchase of specific commodities (*i. e.*, the opening and operating of closed stations on a temporary basis while a permanent dealer was being sought or the serving as a supply point for the delivery of TBA)—is legally baseless. Plaintiffs' contention that, without earning it, they should receive for every day they were dealers treble the amount that others worked to earn, is utterly frivolous. Again, there is a total failure on plaintiffs' part with respect to proximate injury and measurable damages.

## JUDGMENT

It is therefore ordered that Texaco's motion for summary judgment is granted and judgment is entered in favor of Defendant Texaco and against plaintiffs, whose complaint is hereby dismissed with prejudice at plaintiffs' cost. This order shall serve as Findings of Fact and Conclusions of Law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.