ENTERPRISE INDUSTRIES, Inc.,
Plaintiff-Appellee,

v.

The TEXAS COMPANY, Defendant-
Appellant.

No. 21, Docket 24045.

United States Court of Appeals
Second Circuit.

Argued Nov. 9, 1956.

Decided Jan. 7, 1957.

Milton Handler, New York City, Day, Berry & Howard, Hartford, Conn., Oscar John Dorwin, Amzy B. Steed, New York City, W. Robert Hartigan, Hartford, Conn., Abram J. Chayes, Washington, D. C., Stanley D. Robinson, New York City, of counsel, for appellant.

Wallace R. Burke, Hartford, Conn., Samuel Steinberg, John J. Daly, Hartford, Conn., of counsel, for appellee.

Before HAND, MEDINA and LUMBARD, Circuit Judges.

HAND, Circuit Judge.

The defendant appeals from a judgment for the plaintiff in an action tried to a judge, awarding treble damages suffered by the defendant's violation of the Robinson-Patman Act, § 13(a), Title 15 U.S.C.A. The plaintiff was a corporation, operating a gasoline "filling station" in the town of Wethersfield, Connecticut,

on the right hand side, going south, of the main highway from Boston to New York, a short distance south of the boundary of Hartford. During the period in suit it was a lessee of this station from the defendant at a rent that for the purposes of this action may be taken as two cents for every gallon of gasoline sold. It is not uncommon in the industry for a filling station to start what has come to be known as a "gas war"; that is, to cut the prevailing price of gasoline, which other competing stations must meet by a corresponding cut in order to keep up their sales; and that makes it important, if indeed not necessary, for the producing companies to reduce their price to their own competing stations. In the neighborhood of the city of Hartford between November 1950 and February 1952, two such "wars" occurred: the first lasted from November 1950 to July 1951; the second from November 1951 to February 1952. In each period the defendant by a rebate or allowance reduced its selling price to its tributary stations enough to enable them to meet a price cut, and yet to keep a net margin to each of two cents.

During a price war different prices prevail in different areas, dependent apparently upon the relative advantage of position of the stations. Moreover, as it was the defendant's practice not to underbid the prices of other producers, it imposed as a condition upon any allowance or rebate that its stations should not undercut the prevailing price for other brands. Thus it followed that, although the defendant cut its price enough to allow Texaco stations to meet the reduction, its price to a station, which like the plaintiff's was in an area of higher prices, was higher than its price to Texaco stations in areas of lower prices. This was the discrimination of which the plaintiff complained, for it alleged that a greater allowance was extended to Texaco stations that were in competition with itself.

The larger part of the plaintiff's sales were to cars coming from points east of Hartford and bound south; and, as there were no stations of any kind for about forty miles to the east on the main highway, the plaintiff enjoyed as to this through traffic an important advantage. On the other hand Judge Smith found that there were nine Texaco stations so situated that they did compete with the plaintiff for local sales, by which he meant sales to cars of workmen and others that commuted back and forth from Hartford, in some cases for a distance of twenty miles or more. Such buyers were advised of the prices posted by the different stations as they passed, and would select the lowest. This finding the defendant challenges as "clearly erroneous" because the testimony was not definite that these stations did compete with the plaintiff, but at most proved no more than that there might be such competition.

■■ However, even though we were to agree that the finding was right, and that for that reason the plaintiff had proved its claim for relief, we do not think that it proved the amount of its damages, or indeed that it suffered any damages at all. The wrong was in selling gasoline to the nine Texaco competitors at a lower price than to the plaintiff; and a distinction should be made at the outset between the first "gas war"—November 1, 1950 to July 1951—and the second—November 1951 to February 1952. During the second the plaintiff refused to accept any allowance or rebate and in consequence was free to charge what it could get for gasoline. The *equation* measuring *its loss in that period* may therefore be stated as follows. The gross loss was the profit on any sales that it would have made to the nine competitors' customers whom it could and would, have retained, had it been able to buy from the defendant at the same price as the competitors. From this must, however, be deducted what added profit it may have got by being free to charge what it chose, particularly in the through traffic where there was little competition. Moreover, we have no reliable figures from which to appraise either the gross loss or the gain, for the

plaintiff has not shown how much of the business of the nine Texaco competitors it would have retained or obtained at the same price as they; and equally we do not know what would have been its profit on the south bound through traffic if it had sold at the prevailing prices.

So much, therefore, for the second "war." During the first the plaintiff had had the advantage of the rebate or allowance, but had been obliged to sell to all customers at the prices prevailing in its area, as well as to pay a higher price than the nine. Of course the profit gained by means of the rebate or allowance may have been less than that lost by the lower prices granted to the nine together with the lower prices required to meet the prevailing prices in the through traffic; but it is impossible to know whether that was so, and even more impossible to appraise what the loss was, if there was any. The plaintiff kept no books from which it could be learned what were its profits from either part of its business, and even if it had, there was uncontradicted evidence that in June of 1951 the plaintiff was not charging the prevailing price. Moreover, the "wire recording" of the interview between Raymond, the plaintiff's president, and two of the defendant's officers, leaves no doubt that in that month they were complaining to him of his failure to conform. For these reasons we hold that there was also no evidence that would have sustained a finding as to the plaintiff's loss during the first "war."

The judge proceeded by an entirely different method; he assessed the damages by accepting as the measure of the plaintiff's loss the difference between the sale price charged the plaintiff and the lowest price charged any of the nine Texaco stations. For this he relied upon the decision of the majority of the Eighth Circuit in Elizabeth Arden Sales Corp. v. Gus Blass Co., 150 F.2d 988. In Sun Cosmetic Shoppe v. Elizabeth Arden Sales Corp., 2 Cir., 178 F.2d 150, we held that the discrimination was not a proper measure of the loss; and the Eighth Circuit appears to have overruled its earlier view in a second majority decision, American Can Co. v. Russellville Canning Co., 191 F.2d 38. There remains, however, a passage in the opinion of the Supreme Court in Bruce's Juices, Inc. v. American Can Co., 330 U.S. 743, 757, 67 S.Ct. 1015, 1021, 91 L.Ed. 1219, in which Justice Jackson said that, if the buyer showed that the prices charged were "discriminatory, * * * it would establish its right to recover three times the discriminatory difference without proving more than the illegality of the prices. If the prices are illegally discriminatory, petitioner has been damaged, in the absence of extraordinary circumstances, at least in the amount of that discrimination." The question then before the court was whether discrimination should bar a seller from recovering the contract price from the buyer and should confine him to a recovery on a *quantum meruit;* and the passage quoted was only an answer to the buyer's argument that, unless he was allowed to disaffirm the sale, he would be without any other relief. In that case the addition of 5% to the cost to the plaintiff of its cans, even if coupled with relief from "delivery charges", 155 Fla. 877, 22 So.2d 461, might well not have been passed on to the consumer, and have been absorbed by the canners, who sold fruit juices in cans. If that were true, the amount of the discrimination might well be a proper measure of the buyer's damages. On the other hand, in the case at bar we have as little means of knowing whether or how far the plaintiff passed on to car owners any difference in the price charged it, as we have of knowing how far the addition affected the gallonage that it sold. In Interstate Commerce Comm. v. United States, 289 U.S. 385, 53 S.Ct. 607, 77 L.Ed. 1273, it is true that an award to the shipper of the "discrimination" would presumably have been unlawful, because by hypothesis the rate charged him had been reasonable. Nevertheless, the reasoning of Cardozo, J., in discussing the proper way to measure damages is rele-

vant here. "If by reason of the discrimination, the preferred producers have been able to divert business that would otherwise have gone to the disfavored shipper, damage has resulted to the extent of the diverted profits. If the effect of the discrimination has been to force the shipper to sell at a lowered * * * price * * * damage has resulted to the extent of the reduction. But none of these consequences is a necessary inference from discrimination without more" 289 U.S. at pages 390, 391, 53 S.Ct. at page 610. "Overcharge and discrimination have very different consequences, and must be kept distinct in thought" 289 U.S. at page 390, 53 S.Ct. at page 609.

■ At all events the statute should not be read as creating any presumption that "where the fact of damage is shown * * * the pecuniary amount or equivalent of the prohibited discrimination" is the proper "measure of damages." Exactly that was a provision in the bill, when it came from the Senate to the House (S. 3154, 74th Cong., 2d Sess.), and it was eliminated in conference. This action becomes particularly persuasive in contrast with the retention of that part of § 13(b) that imposes a burden of proof on the seller as to the effect of a "discrimination."[1] Congress obviously did not wish the seller to be under a double burden, as soon as the buyer proved that he had been charged a higher price than any of his competitors; especially the burden of proving the negative upon an issue as to which the seller could know nothing and the buyer everything. Indeed, that was a burden that Congress might well hesitate to impose in an action in which the seller must not only make good the buyer's loss, but also pay him a fine in double the amount of his loss. It is fair to suppose that, if Congress had thought the evil of price discrimination so great as to require so drastic a procedural support, it would have made its purpose more clear.

In view of what we have said it is not necessary to consider whether the defendant proved its defense under the proviso to § 13(b). All the evidence was so fully developed that there is no reason for another trial.

Judgment reversed; complaint dismissed.

---

1. Samuel H. Moss, Inc., v. Federal Trade Commission, 2 Cir., 148 F.2d 378, certiorari denied 326 U.S. 734, 66 S.Ct. 44, 90 L.Ed. 438; Federal Trade Commission v. Standard Brands, Inc., 2 Cir., 189 F.2d 510, 515.