# J. TRUETT PAYNE CO., INC. *v.* CHRYSLER MOTORS CORP.

No. 79–1944.  Argued January 21, 1981—Decided May 18, 1981

REHNQUIST, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, WHITE, and STEVENS, JJ., joined. POWELL, J., filed an opinion dissenting in part, in which BRENNAN, MARSHALL, and BLACKMUN, JJ., joined, *post*, p. 569.

*C. Lee Reeves* argued the cause and filed briefs for petitioner.

*J. Ross Forman III* argued the cause and filed a brief for respondent.*

---

*Robert H. Whaley* filed a brief for Ricky Hasbrouck et al. as *amici curiae* urging reversal.

Briefs of *amici curiae* were filed by *Thomas E. Deacy, Jr., E. Houston*

Justice Rehnquist delivered the opinion of the Court.

The question presented in this case is the appropriate measure of damages in a suit brought under § 2 (a) of the Clayton Act, as amended by the Robinson-Patman Act.[1]

Petitioner, for several decades a Chrysler-Plymouth dealer in Birmingham, Ala., went out of business in 1974. It subsequently brought suit against respondent in the United States District Court for the Northern District of Alabama, alleging that from January 1970 to May 1974 respondent's various "sales incentive" programs violated § 2 (a). Under one type of program, respondent assigned to each participating dealer a sales objective and paid to the dealer a bonus on each car sold in excess of that objective. Under another type of program, respondent required each dealer to purchase from it a certain quota of automobiles before it would pay a bonus on the sale of automobiles sold at retail. The amount of the

---

Harsha, and *Alan I. Becker*, for Cessna Aircraft Co.; and by *John T. Cusack* and *Gordon B. Nash, Jr.*, for Vanco Beverage, Inc.

[1] Section 2 (a) of the Clayton Act, 38 Stat. 730, as amended by the Robinson-Patman Act, 49 Stat. 1526, 15 U. S. C. § 13 (a), provides in pertinent part:

"It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States . . . and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy or prevent competition with any person who either grants or knowingly receives the benefits of such discrimination, or with customers of either of them . . . ."

Section 4 of the Clayton Act, 38 Stat. 731, 15 U. S. C. § 15, provides:

"Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover three-fold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."

bonus depended on the number of retail sales (or wholesale purchases) made in excess of the dealer's objective, and could amount to several hundred dollars. Respondent set petitioner's objectives higher than those of its competitors, requiring it to sell (or purchase) more automobiles to obtain a bonus than its competitors. To the extent petitioner failed to meet those objectives and to the extent its competitors met their lower objectives, petitioner received fewer bonuses. The net effect of all this, according to petitioner, was that it paid more money for its automobiles than did its competitors. It contended that the amount of the price discrimination—the amount of the price difference multiplied by the number of petitioner's purchases—was $81,248. It also claimed that the going-concern value of the business as of May 1974 ranged between $50,000 and $170,000.

Respondent maintained that the sales incentive programs were nondiscriminatory, and that they did not injure petitioner or adversely affect competition. The District Court denied respondent's motion for a directed verdict. The jury returned a verdict against respondent and awarded petitioner $111,247.48 in damages, which the District Court trebled.

The Court of Appeals for the Fifth Circuit reversed with instructions to dismiss the complaint. 607 F. 2d 1133 (1979). It found that in order to recover treble damages under § 4 of the Clayton Act, a plaintiff must prove (1) a violation of the antitrust laws, (2) cognizable injury attributable to the violation, and (3) at least the approximate amount of damage. It found it unnecessary to consider whether petitioner proved that respondent's incentive programs violated § 2 (a) because, in its view, petitioner had "failed to introduce substantial evidence of injury attributable to the programs, much less substantial evidence of the amount of such injury." *Id.*, at 1135. Rejecting petitioner's theory of "automatic damages," under which mere proof of discrimination establishes the fact and amount of injury, the court held that injury must be proved by more than mere "[c]onclusory statements

by the plaintiff, without evidentiary support." *Id.*, at 1136–1137. The court concluded that the District Court erred in refusing respondent's motion for a directed verdict and in denying its motion for judgment notwithstanding the verdict. We granted certiorari, 449 U. S. 819 (1980), to review the decision of the Court of Appeals.

## I

Petitioner first contends that once it has proved a price discrimination in violation of § 2 (a) it is entitled at a minimum to so-called "automatic damages" in the amount of the price discrimination. Petitioner concedes that in order to recover damages it must establish cognizable injury attributable to an antitrust violation and some approximation of damage. Brief for Petitioner 9. It insists, however, that the jury should be permitted to infer the requisite injury and damage from a showing of a substantial price discrimination. Petitioner notes that this Court has consistently permitted such injury to be inferred in injunctive actions brought to enforce § 2 (a), *e. g., FTC* v. *Morton Salt Co.*, 334 U. S. 37 (1948), and argues that private suits for damages under § 4 should be treated no differently. We disagree.[2]

By its terms § 2 (a) is a prophylactic statute which is violated merely upon a showing that "the effect of such discrimination *may be* substantially to lessen competition."

---

[2] The automatic-damages theory has split the lower courts. The leading case approving the theory is *Fowler Manufacturing Co.* v. *Gorlick*, 415 F. 2d 1248 (CA9 1969), cert. denied, 396 U. S. 1012 (1970). See also *Elizabeth Arden Sales Corp.* v. *Gus Blass Co.*, 150 F. 2d 988 (CA8) (involving §§ 2 (d) and 2 (e) of the Act), cert. denied, 326 U. S. 773 (1945); *Grace* v. *E. J. Kozin Co.*, 538 F. 2d 170 (CA7 1976) (involving § 2 (c) of the Act). The leading case rejecting the theory is *Enterprise Industries, Inc.* v. *Texas Co.*, 240 F. 2d 457 (CA2), cert. denied, 353 U. S. 965 (1957). Accord, *Edward J. Sweeney & Sons, Inc.* v. *Texaco, Inc.*, 637 F. 2d 105 (CA3 1980); *McCaskill* v. *Texaco, Inc.*, 351 F. Supp. 1332 (SD Ala. 1972), affirmance order, 486 F. 2d 1400 (CA5 1973); *Kidd* v. *Esso Standard Oil Co.*, 295 F. 2d 497 (CA6 1961).

(Emphasis supplied.) As our cases have recognized, the statute does not "require that the discriminations must in fact have harmed competition." *Corn Products Refining Co. v. FTC,* 324 U. S. 726, 742 (1945); *FTC* v. *Morton Salt Co., supra,* at 46 ("the statute does not require the Commission to find that injury has actually resulted"). Section 4 of the Clayton Act, in contrast, is essentially a remedial statute. It provides treble damages to "[a]ny person who *shall be injured* in his business or property by reason of anything forbidden in the antitrust laws . . . ." (Emphasis supplied.) To recover treble damages, then, a plaintiff must make some showing of actual injury attributable to something the antitrust laws were designed to prevent. *Perkins* v. *Standard Oil Co.,* 395 U. S. 642, 648 (1969) (plaintiff "must, of course, be able to show a causal connection between the price discrimination in violation of the Act and the injury suffered"). It must prove more than a violation of § 2 (a), since such proof establishes only that injury *may* result.

Our decision here is virtually governed by our reasoning in *Brunswick Corp.* v. *Pueblo Bowl-O-Mat, Inc.,* 429 U. S. 477 (1977). There we rejected the contention that the mere violation of § 7 of the Clayton Act, which prohibits mergers which *may* substantially lessen competition, gives rise to a damages claim under § 4. We explained that "to recover damages [under § 4] respondents must prove more than that the petitioner violated § 7, since such proof establishes only that injury may result." *Id.,* at 486. Likewise in this case, proof of a violation does not mean that a disfavored purchaser has been actually "injured" within the meaning of § 4.

The legislative history buttresses this view. Both the Patman bill, H. R. 8442, § 2 (d), 74th Cong., 1st Sess. (1935), as introduced in the House, and the Robinson bill, S. 3154, § 2 (d), 74th Cong., 2d Sess. (1935), as introduced in the Senate, provided that a plaintiff's damages for a violation of § 2 (a) shall be presumed to be the amount of the price discrimination. The provision, however, encountered such

strong opposition in both Houses that the House Committee eliminated it from its bill, H. R. Rep. No. 2287, 74th Cong., 2d Sess., 16 (1936), and the Senate Committee modified the provision to authorize presumptive damages in the amount of the discrimination only when plaintiff shows the "fact of damage." S. Rep. No. 1502, 74th Cong., 2d Sess., 8 (1936). The Conference Committee eliminated even that compromise, and § 2 (a) was passed in its present form. Congress thus has rejected the very concept which petitioner seeks to have the Court judicially legislate. *Gulf Oil Corp.* v. *Copp Paving Co.,* 419 U. S. 186, 199–201 (1974).[3]

## II

Petitioner next contends that even though it may not be entitled to "automatic damages" upon a showing of a violation of § 2 (a), it produced enough evidence of actual injury to survive a motion for a directed verdict. That evidence consisted primarily of the testimony of petitioner's owner, Mr. Payne, and an expert witness, a professor of economics. Payne testified that the price discrimination was one of the causes of the dealership going out of business. In support of that contention, he testified that his salesmen told him that the dealership lost sales to its competitors, and that its market share of retail Chrysler-Plymouth sales in the Birmingham area was 24% in 1970, 27% in 1971, 23% in 1972, and 25% in 1973. Payne contended that it was proper to infer that the 4% drop in 1972 was a result of the incentive pro-

---

[3] Relying on *Bruce's Juices, Inc.* v. *American Can Co.,* 330 U. S. 743, 757 (1947), petitioner argues that this Court has previously accepted the automatic-damages theory. In that case, the Court stated that if petitioner can show an illegal price discrimination under the Act, "it would establish its right to recover three times the discriminatory difference without proving more than the illegality of the prices." *Ibid.* . But that statement is merely dictum, since the only issue before the Court was whether a violation of § 2 (a) could be used as an affirmative defense to void a contract.

grams. He also testified that the discrimination caused him to "force" business so that he could meet his assigned quotas. That is, his desire to make a sale induced him to "overallow" on trade-ins, thus reducing his profits on his used car operation. App. 51–52. Payne adduced evidence showing that his average gross profit on used car sales was below that of his competitors, though that same evidence revealed that his average gross profit on new sales was higher. *Id.*, at 269.

Neither Payne nor petitioner's expert witness offered documentary evidence as to the effect of the discrimination on retail prices. Although Payne asserted that his salesmen and customers told him that the dealership was being undersold, *id.*, at 35–37, 92, 95, he admitted he did not know if his competitors did in fact pass on their lower costs to their customers. *Id.*, at 44, 57. Petitioner's expert witness took a somewhat different position. He believed that the discrimination would ultimately cause retail prices to be held at an artificially high level since petitioner's competitors would not reduce their retail prices as much as they would have done if petitioner received an equal bonus from respondent. *Id.*, at 103, 135. He also testified that petitioner was harmed by the discrimination even if the favored purchasers did not lower their retail prices, since petitioner in that case would make less money per car.[4] *Id.*, at 139.

---

[4] Respondent suggests that petitioner's inability to show that his favored competitors lowered their retail sales price should defeat recovery. That argument assumes that evidence of a lower retail price is the *sine qua non* of antitrust injury, that the disfavored purchaser is simply not "injured" unless the favored purchaser has lowered his price. If the favored purchaser has lowered his retail price, for example, the disfavored purchaser will lose sales to the extent it does not match that lower price. Similarly, if the disfavored purchaser matches the lower price, it will lose profits. Because petitioner has not shown that the favored purchasers have lowered their retail price, petitioner is arguably foreclosed from showing that it lost either sales or profits. Justice Cardozo seemingly adopted

Even construed most favorably to petitioner, the evidence of injury is weak. Petitioner nevertheless asks us to consider the sufficiency of its evidence in light of our traditional rule excusing antitrust plaintiffs from an unduly rigorous standard of proving antitrust injury. In *Zenith Radio Corp.* v. *Hazeltine Research, Inc.,* 395 U. S. 100, 123–124 (1969), for example, the Court discussed at some length the fixing of damages in a case involving market exclusion. We accepted the proposition that damages could be awarded on the basis of plaintiff's estimate of sales it could have made absent the violation:

> "[D]amage issues in these cases are rarely susceptible of the kind of concrete, detailed proof of injury which is available in other contexts. The Court has repeatedly held that in the absence of more precise proof, the fact-finder may 'conclude as a matter of just and reasonable inference from the proof of defendants' wrongful acts and their tendency to injure plaintiffs' business, and from the evidence of the decline in prices, profits and values, not shown to be attributable to other causes,

this position in *ICC* v. *United States,* 289 U. S. 385, 390–391 (1933), a case involving rate discrimination under the Interstate Commerce Act:

"If by reason of the discrimination, the preferred producers have been able to divert business that would otherwise have gone to the disfavored shipper, damage has resulted to the extent of the diverted profits. If the effect of the discrimination has been to force the shipper to sell at a lowered price . . . damage has resulted to the extent of the reduction. But none of these consequences is a necessary inference from discrimination without more."

Petitioner argues that is an overly narrow view of antitrust injury. To the extent a disfavored purchaser must pay more for its goods than its competitors, it is less able to compete. It has fewer funds available with which to advertise, make capital expenditures, and the like. Although the inability of petitioner to show that the favored retailers lowered their retail price makes petitioner's argument particularly weak, we find it unnecessary to decide in this case whether such failure as a matter of law demonstrates no competitive injury.

that defendants' wrongful acts had caused damage to the plaintiffs.' *Bigelow* v. *RKO Pictures, Inc., supra,* at 264. See also *Eastman Kodak Co.* v. *Southern Photo Materials Co.,* 273 U. S. 359, 377–379 (1927); *Story Parchment Co.* v. *Paterson Parchment Paper Co.,* 282 U. S. 555, 561–566 (1931)." *Ibid.*

In *Bigelow* v. *RKO Radio Pictures, Inc.,* 327 U. S. 251 (1946), relied on in *Zenith,* film distributors had conspired to deny the plaintiff theater access to first-run films. The jury awarded damages based on a comparison of plaintiff's actual profits with the contemporaneous profits of a competing theater with access to first-run films. Plaintiff had also adduced evidence comparing his actual profits during the conspiracy with his profits when he had been able to obtain first-runs. The lower court thought the evidence too imprecise to support the award, but we reversed because the evidence was sufficient to support a "just and reasonable inference" of damage. We explained:

> "[A]ny other rule would enable the wrongdoer to profit by his wrongdoing at the expense of his victim. It would be an inducement to make wrongdoing so effective and complete in every case as to preclude any recovery, by rendering the measure of damages uncertain. Failure to apply it would mean that the more grievous the wrong done, the less likelihood there would be of a recovery." 327 U. S., at 264–265.

Our willingness to accept a degree of uncertainty in these cases rests in part on the difficulty of ascertaining business damages as compared, for example, to damages resulting from a personal injury or from condemnation of a parcel of land. The vagaries of the marketplace usually deny us sure knowledge of what plaintiff's situation would have been in the absence of the defendant's antitrust violation. But our willingness also rests on the principle articulated in cases such as *Bigelow,* that it does not " 'come with very good grace' " for

the wrongdoer to insist upon specific and certain proof of the injury which it has itself inflicted. *Hetzel* v. *Baltimore & Ohio R. Co.*, 169 U. S. 26, 39 (1898) (quoting *United States Trust Co.* v. *O'Brien*, 143 N. Y. 284, 289, 38 N. E. 266, 267 (1894). Accord, *Story Parchment Co.* v. *Paterson Parchment Paper Co.*, 282 U. S. 555, 563 (1931) ("Where the tort itself is of such a nature as to preclude the ascertainment of the amount of damages with certainty, it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts") ; *Eastman Kodak Co.* v. *Southern Photo Materials Co.*, 273 U. S. 359, 379 (1927).

Applying the foregoing principles to this case is not without difficulty. In the first place, it is a close question whether petitioner's evidence would be sufficient to support a jury award even under our relaxed damages rules. In those cases where we have found sufficient evidence to permit a jury to infer antitrust injury and approximate the amount of damages, the evidence was more substantial than the evidence presented here. In *Zenith,* for example, plaintiff compared its sales in Canada, where it was subject to a violation, with its sales in the United States, where it was not. And in *Bigelow,* plaintiff adduced evidence not only comparing its profits with a competitor not subject to the violation but also comparing its profits during the time of the violation with the period immediately preceding the violation.[5]

---

[5] *Story Parchment Co.* v. *Paterson Parchment Paper Co.*, 282 U. S. 555 (1931), is similarly distinguishable. In upholding a jury verdict against respondents for a violation of § 2 of the Sherman Act, the Court observed: "It is true that there was uncertainty as to the extent of damage, but there was none as to the fact of damage; and there is a clear distinction between the measure of proof necessary to establish the fact that petitioner had sustained some damage, and the measure of proof necessary to enable the jury to fix the amount. The rule which precludes the recovery of uncertain damages applies to such as are not the certain result

But a more fundamental difficulty confronts us in this case. The cases relied upon by petitioner all depend in greater or lesser part on the inequity of a wrongdoer defeating the recovery of damages against him by insisting upon a rigorous standard of proof. In this case, however, we cannot say with assurance that respondent is a "wrongdoer." Because the court below bypassed the issue of liability and went directly to the issue of damages, we simply do not have the benefit of its views as to whether respondent in fact violated § 2 (a). Absent such a finding, we decline to apply to this case the lenient damages rules of our previous cases. Had the court below found a violation, we could more confidently consider the adequacy of petitioner's evidence.

Accordingly, we think the proper course is to remand the case so that the Court of Appeals may pass upon respondent's contention that the evidence adduced at trial was insufficient to support a finding of violation of the Robinson-Patman Act. We do not ordinarily address for the first time in this Court an issue which the Court of Appeals has not addressed, and we think this would be a poor case in which to depart from that practice. If the court determines on remand that respondent did violate the Act, the court should then consider the sufficiency of petitioner's evidence of injury in light of the cases discussed above. We, of course, intimate no views as to how that issue should be decided. We emphasize that even if there has been a violation of the Robinson-Patman Act, petitioner is not excused from its burden of proving antitrust injury and damages. It is simply that once a violation has been established, that burden is to some extent lightened.

---

of the wrong, not to those damages which are definitely attributable to the wrong and only uncertain in respect of their amount. . . ." *Id.*, at 562. "If the damage is certain, the fact that its extent is uncertain does not prevent a recovery." *Id.*, at 566.

In this case, by contrast, the issue is not so much the amount of damages as whether petitioner has in fact been injured by an antitrust violation.

For the foregoing reasons, the judgment of the Court of Appeals is vacated, and the case is remanded for proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE POWELL, with whom JUSTICE BRENNAN, JUSTICE MARSHALL, and JUSTICE BLACKMUN join, dissenting in part.

I concur in Part I of the Court's opinion, but simply would affirm the judgment of the Court of Appeals.

The Court of Appeals concluded that petitioner "failed to introduce substantial evidence of injury attributable to [respondent's program], much less substantial evidence of the amount of such injury." 607 F. 2d 1133, 1135. In Part II of its opinion, the Court today reviews the evidence, vacates the judgment of the Court of Appeals, and remands the case for a resifting of the evidence and determination of whether respondent violated the Clayton Act as amended by the Robinson-Patman Act. The Court identifies no error of fact or law in the judgment of the Court of Appeals, but vacates that judgment only because the Court finds it "unclear" whether there is sufficient evidence. I find no basis for this Court undertaking to second-guess the Court of Appeals as to the sufficiency of evidence.

Even if there were some satisfactory reason for us to review the evidence in this relatively uncomplicated case, I think the Court of Appeals was plainly correct in finding petitioner's evidence insufficient to show a competitive injury of the kind that the antitrust laws were enacted to prevent. See *Brunswick Corp.* v. *Pueblo Bowl-O-Mat, Inc.,* 429 U. S. 477, 488–489 (1977). Section 2 (a) is a prophylactic statute that makes unlawful price discrimination that "may . . . lessen competition." Thus, a court cannot infer from the fact of a violation that defendant's behavior has caused plaintiff any injury. A plaintiff must show, to recover damages for violation of § 2 (a), that unlawful discrimination in price allowed a favored competitor to draw sales or profits

from him, the unfavored competitor. See *Enterprise Industries, Inc.* v. *Texas Co.,* 240 F. 2d 457, 458 (CA2), cert. denied, 353 U. S. 965 (1957). Petitioner's evidence, which the Court concedes to be "weak," *ante,* at 565, amounts to nothing more than a showing that its market share declined temporarily 4% in 1972. Petitioner presented no substantial evidence that respondent's incentive program caused its market share to shrink. Indeed, over the 4-year period of the challenged programs its market share increased 1%. Rather, petitioner relied on its president's conclusory testimony, which consisted in major part of hearsay statements from petitioner's automobile salesmen. Hypothetical analysis of the "predicted effects" of respondent's program by an economics professor also was relied upon by petitioner to prove the actual cause of injury. One hardly would expect this Court to reject a Court of Appeals judgment that evidence as flimsy as this was insufficient to go to the jury.

My concern with the Court's opinion, however, goes beyond its reviewing the evidence. I have understood that in a Robinson-Patman Act case the plaintiff has the burden of proving the fact of antitrust injury by a preponderance of the evidence. See *Perkins* v. *Standard Oil Co.,* 395 U. S. 642, 648 (1969). Only when this fact has been proved may a court properly be lenient in the evidence it requires to prove the amount of damages. See *Story Parchment Co.* v. *Paterson Parchment Paper Co.,* 282 U. S. 555, 562 (1931). It is not at all apparent that the Court adequately recognizes this distinction.

It seems to me that today's remand measurably increases the uncertainty inherent in the generalities of the Robinson-Patman Act. Accordingly, I dissent.