Ricky HASBROUCK, d/b/a Rick's Texaco, et al., Plaintiffs,

v.

TEXACO, INC., a foreign corporation, Defendant.

No. C–76–027–JLQ.

United States District Court, E.D. Washington.

Sept. 11, 1985.

Robert Whaley, Lucinda Whaley, Spokane, Wash., for plaintiffs.

William Fremming Nielsen, Spokane, Wash., Randall Robinson, Mark Litvack, White Plains, N.Y., Ira Sacks, New York City, for defendant.

MEMORANDUM OPINION AND OR-
DER DENYING MOTION FOR
JNOV OR NEW TRIAL

QUACKENBUSH, District Judge.

AS SCHEDULED, this matter came on
for oral argument in Spokane, Washington
on August 14, 1985. Plaintiffs were repre-
sented by Robert Whaley and Lucinda
Whaley. William Fremming Nielsen, Ran-
dall Robinson, Mark Litvack and Ira Sacks
appeared on behalf of the defendants.

Upon consideration of the record and the
oral presentations of counsel, the court
rules as follows: defendant's motion for
judgment notwithstanding the verdict or a
new trial (Ct.Rec. 739) is DENIED.

## DISCUSSION

A. *Judgment Notwithstanding The Ver-
dict:*

Pursuant to Fed.R.Civ.P. 50(b), Texaco
asks this court to set aside the verdict and
enter judgment in accordance with its mo-
tion for directed verdict.[1] Such a motion
may be granted only if the jury's verdict is
not supported by substantial evidence. *Los
Angeles Memorial Coliseum Com'n v. Na-
tional Football League,* 726 F.2d 1381,
1392 (9th Cir.1984). Stated another way, a
judgment notwithstanding the verdict is ap-
propriate when the evidence permits only

one reasonable conclusion as to a verdict
and the jury's verdict is inconsistent with
that conclusion. *See Walker v. KFC
Corp.,* 728 F.2d 1215, 1223 (9th Cir.1984).
In making that analysis, this court is pro-
hibited from considering witness credibility
or weighing the evidence but must view the
evidence in the light most favorable to the
plaintiffs. *Los Angeles Memorial Colise-
um Com'n v. National Football League,*
726 F.2d at 1392. Applying those princi-
ples to each of the four grounds asserted in
defendant's motion, the court concludes the
verdict must stand.

1. *Price differentials as "functional
discounts":*

A "functional discount" is a tradi-
tional technique used in business pricing
practices. Sawyer, *Business Aspects of
Pricing Under the Robinson-Patman Act*
(1963). A functional discount occurs where
a buyer is permitted to purchase a product
for a lower price than another buyer be-
cause of the different levels of distribution
occupied by the buyers or because the buy-
ers perform different functions in the sell-
er's marketing system.[2] The primary justi-
fication for the discount is to compensate
the buyer for its cost of performing func-
tions ordinarily performed by the seller.[3]

---

1. The reasons set forth in this opinion for deny-
ing Texaco's JNOV motion are also intended to
supplement the court's oral ruling denying de-
fendant's motion for a directed verdict.

2. Some economists and commentators have dis-
tinguished between the terms "functional dis-
count" and "trade discount." See *Boise Cascade
Corp.,* Docket No. 9133, slip op. at 99–100 (Feb.
14, 1984) (initial decision); Calvani, *Functional
Discounts Under The Robinson-Patman Act,* 17
B.C.Indus. & Comm.L.Rev. 543, 5454 n. 9
(1976). Technically, a "functional discount" dis-
regards the buyer's level in the distribution
scheme and rewards the buyer for actually per-
forming functions which otherwise would be
performed by the seller. A "trade discount", on
the other hand, is given to a buyer based upon
the buyer's level in the distribution scheme and
is completely independent of the functions per-
formed by the buyer. Thus, a "trade discount"
should be available to all buyers who operate at
the same trade level regardless of the actual
functions performed and a "functional dis-

count" should be available to any buyer—re-
gardless of its trade level—who performs func-
tions for the seller. Although defendant Texaco
has not made this distinction, and it is question-
able whether the distinction is of any legal im-
portance, *see* Rill, *Availability and Functional
Discounts Justifying Discriminatory Pricing,* 53
Antitrust L.J. 929, 936 (1985), the thrust of de-
fendant's argument appears to fall within the
parameters of functional discount in its more
limited, technical sense, *i.e.* that Dompier and
Gull were performing functions which Texaco
would otherwise have performed.

3. The functional discount concept is distin-
guished from the cost justification defense, 15
U.S.C. § 13(a), in that the former focuses on the
buyer's cost of performing the seller's functions
and the latter is concerned with comparing the
seller's costs of servicing one buyer versus the
cost of servicing another buyer. Understand-
ably, many commentators, including a chair-
man of the A.B.A.'s Robinson-Patman Act Com-
mittee of the Section of Antitrust Law, find it a

Generally, functional discounts do not trigger Robinson-Patman Act liability either because the buyer who receives the discount and the buyer who does not are on different trade levels (and therefore are not competitors) or because the discount merely offsets the competing buyer's additional costs incurred in performing the seller's functions. In other words, if the buyers do not function at the same level the requisite "competitive injury" is unlikely. Similarly, if the discount merely offsets the buyer's additional costs, it is unlikely the buyer's condition would be enhanced enough to cause an injury to competition. Thus, the critical question in determining the legality of a functional discount is whether the price differential has an adverse effect on competition; if it does, and conventional defenses are absent, the discount violates the Act. 3 Kintner & Bauer, *Federal Antitrust Law*, 308 (1983) ("underlying inquiry . . .: is there injury to competition?"); Antitrust Section, Monograph No. 4, *The Robinson-Patman Act: Policy and Law, Volume 1* 54 (1980) (legality of functional discounts "depends upon the absence of adverse competitive effects"); Calvani, *Functional Discounts Under the Robinson-Patman Act*, 17 B.C. Indus. & Comm.L.Rev. 543, 546 (1976) (legitimacy of functional discounts "depends on the absence of an anticompetitive effect"); *Mueller Company v. Federal Trade Commission*, 60 F.T.C. 120, 129 (1962), *aff'd* 323 F.2d 44 (7th Cir.1963), *quoting General Foods Corporation*, 52 F.T.C. 798 (1956) (the Robinson-Patman Act permits "lower prices to one functional class as against another, provided that injury to commerce as contemplated by the law does not result . . ."); *Doubleday and Company, Inc.*, 52 F.T.C. 169, 207 (1955)

("traditional [functional] discounts . . . remained lawful under the Robinson-Patman Act unless engendering adverse effects on competition . . ."); *cf. FLM Collision Parts, Inc. v. Ford Motor Co.*, 543 F.2d 1019, 1027 (2nd Cir.1976), *cert. denied*, 429 U.S. 1097, 97 S.Ct. 1116, 51 L.Ed.2d 545 (1977) ("[w]e do not suggest or imply that . . . a price discount to . . . wholesalers . . . which has the purpose or effect of defeating the objectives of the Act" is beyond the scope of the Act).

■ Even without viewing the evidence in the light most favorable to the plaintiffs, the preponderance of the evidence produced in this case demonstrated that Texaco's functional discounts adversely affected competition. That result was brought about primarily by two reasons. First, since Texaco engaged in dual distribution, *i.e.*, sold to both retailers and distributors, the plaintiffs and the favored buyers were not always in competition.[4] That absence of competition, however, does not negate competitive injury, where, as here, the disfavored buyer competes with the favored buyer's customers. As the Supreme Court recently confirmed, a Robinson-Patman Act violation may occur even though the favored and disfavored buyers are not competitors. *Falls City Industries v. Vanco Beverage, Inc.*, 460 U.S. 428, 103 S.Ct. 1282, 75 L.Ed.2d 174 (1983) (competition was between *customers* of favored buyers and *customers* of disfavored buyers). The record in this case contains substantial evidence that the favored purchasers' (or their customers') lower retail prices attracted customers away from the plaintiffs and that the lower prices were the

---

"confusing distinction." Panel Discussion—Questions and Answers, 53 Antitrust L.J. 967, 968 (1985) (comment by Bernat Rosner).

**4.** Prior to 1974 Dompier Oil Co. did not operate any retail stations but, as a distributor, sold Texaco gasoline to retail stations. Beginning in 1974 Dompier did acquire retail outlets and eventually operated four Texaco retail stations. While there is a serious question as to whether Dompier was entitled to a "functional discount" on the gas it *resold at retail, compare Mueller Co.*, 60 F.T.C. 120 (1962), *affd.*, 323 F.2d 44 (7th

Cir.1963), *cert. denied*, 377 U.S. 923, 84 S.Ct. 1219, 12 L.Ed.2d 215 (1964) (entitlement to functional discount based on resale level) *with Doubleday and Co.*, 52 F.T.C. 169 (1955) (entitlement to functional discount based on level of purchase), the court assumes, *arguendo*, that the mere fact that Dompier retailed the gas does not preclude a "functional discount." *See Boise Cascade Corp.*, Docket No. 9133 Feb. 14, 1984 (initial decision) (Administrative Law Judge urges adherence to *Mueller* rule).

major reason for the diverted sales. Such evidence more than establishes injury to competition. *Falls City Industries v. Vanco Beverage, Inc.*, 460 U.S. at 437–38, 103 S.Ct. at 1290–91, *citing J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 561–62, 101 S.Ct. 1923, 1926–27, 68 L.Ed.2d 442 (1981).

■ Secondly, the functional discounts negatively affected competition because they were, in part, reflected in the favored purchasers' (or their customers') retail prices. In other words, the discount was not consumed or absorbed at the level of the favored buyers; rather, the amount of the discount (or a significant portion) appeared in the favored purchasers' retail price, or in the favored purchasers' price to their customers and in their customers' retail prices. Under such circumstances, the otherwise innocuous nature and presumed legality of functional discounts is rebutted, for it is universally recognized that a functional discount remains legal only to the extent it acts as compensation for the functions performed by the favored buyer. *See* 3 Kintner & Bauer, *Federal Antitrust Law* 309–10 (1983); Rill, *Availability and Functional Discounts Justifying Discriminatory Pricing*, 53 Antitrust L.J. 929, 939–41 (1985). The discount must "be reasonably related to the expenses assumed by the [favored] buyer" and the discount "should not exceed the cost of ... the function [the favored buyer] actually performs ..." *Doubleday and Company*, 52 F.T.C. at 209, *cited* in *Boise Cascade Corp.*, Docket No. 9133, slip op. at 117 (Feb. 14, 1984) (initial decision). If the discount exceeds such costs, it cannot be justified as a functional discount, particularly where, as here, the excess has a negative effect on competition.

■ In this case Texaco made no serious attempt to quantitatively justify its functional discounts. While a precise accounting of the value of the performed functions is not mandated, merely identifying some of the functions is not sufficient.[5] There is no substantial evidence to support Texaco's position that the discounts were justified. In fact, the preponderance of the evidence points to the contrary: had the amount of the discounts been merely reimbursement for the value of the services performed by the favored buyers, it is improbable that the discounts (or a portion) could have been passed along and been reflected in the retail price. Consequently, the price differential and its resultant impact on competition cannot be legitimized under the rubric of functional discount.

### 2. Competitive Injury:

■ To prove a violation of the Robinson-Patman Act, a plaintiff must, *inter alia,* establish that the effect of the price differential *"may be* substantially to lessen competition." Section 2(a). The Act "does 'not require that the discriminations must in fact have harmed competition.'" *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. at 562, 101 S.Ct. at 1927 quoting *Corn Products Refining Co. v. FTC*, 324 U.S. 726, 742, 65 S.Ct. 961, 969, 89 L.Ed. 1320 (1945). Rather, a plaintiff must only show "a reasonable possibility that a price difference may harm competition." *Falls City Industries, Inc. v. Vanco Beverage, Inc.*, 460 U.S. at 434–35, 103 S.Ct. at 1288. That "reasonable possibility of harm is often referred to as *competitive injury." Id.* (emphasis added).

As stated earlier, it is not necessary that there be injury to competition between the favored and disfavored buyer; the Act also encompasses the injury to competition between the disfavored buyer and the favored buyer's customers. *See Falls City Industries, inc. v. Vanco Beverage*, 460 U.S. at 436, 103 S.Ct. at 1289. Accordingly, as there was substantial evidence that the plaintiffs competed with Dompier-sup-

---

**5.** Although Texaco did introduce evidence that Dompier and to some extent Gull were performing marketing and advisory functions, the gasoline hauling function cannot be considered, at least to the extent it was compensated for by the hauling allowance, since the court excluded the hauling allowance from the price differential.

plied retail stations,[6] and the Gull stations, the requisite injury could occur in the competition between plaintiffs and those stations.

In a highly competitive market like retail gasoline where customers are influenced by small price differences, substantial price discrimination over a significant period of time raises an inference of competitive injury. *See FTC v. Morton Salt Co.*, 334 U.S. 37 at 46, 50–51, 68 S.Ct. 822 at 828, 830–31, 92 L.Ed. 1196 (1948). Absent direct evidence of displaced sales, however, "this inference may be overcome by evidence breaking the causal connection between the price differential and lost sales or profits." *Falls City Industries, Inc. v. Vanco Beverage, Inc.*, 460 U.S. at 435, 103 S.Ct. at 1289. But, where the record reveals that the price discrimination as between the favored and nonfavored buyer affects prices to the extent of diverting sales, the plaintiff has "more than established the competitive injury required for a prima facie case under § 2(a)." *Id.* at 437–38, 103 S.Ct. at 1290. The record presented in this case contains substantial evidence that the price discrimination was substantial, that it existed over a significant period of time and that it resulted in the diversion of sales from the plaintiffs to the Dompier-supplied retail stations. The plaintiffs proved diverted sales and the defendant did not produce substantial evidence breaking the causal connection between the diverted sales and the price differential. Therefore, the competitive injury element was established.

3. *Antitrust Injury:*

In addition to proving a prima facie violation of the Act, a plaintiff seeking treble damages "must make some showing of actual injury attributable to something the antitrust laws were designed to prevent." *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. at 562, 101 S.Ct. at 1927. In other words, the plaintiff must show that he was in fact injured, that the injury is of the type the Act was intended to prevent, and that the injury is causally connected with the violation of the Act. *See California Computer Products v. International Business Machines*, 613 F.2d 727, 732 (9th Cir.1979). Such an injury is referred to as "antitrust injury." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977).

The plaintiffs' burden of proving the fact of injury is satisfied by proof of some damage flowing from the unlawful price discrimination. *See Zenith Corp. v. Hazeltine*, 395 U.S. 100, 114 n. 9, 89 S.Ct. 1562, 1571 n. 9, 23 L.Ed.2d 129 (1969); *California Computer Products v. International Business Machines*, 613 F.2d at 732. Although it is not enough that the price discrimination was merely one of several causes, *Handgards, Inc. v. Ethicon, Inc.*, 601 F.2d 986, 997 (9th Cir.1979), the plaintiff "need not exhaust all possible alternative sources of injury"; it is enough that the violation of the Act "is shown to be a *material cause* of the injury." *Zenith Corp. v. Hazeltine*, 395 U.S. at 114, n. 9, 89 S.Ct. at 1571, n. 9 (emphasis added); *Indian Coffee Corp. v. Procter & Gamble Co.*, 752 F.2d 891, 903 (3rd Cir.1985). The plaintiff must prove "with a fair degree of certainty that the defendant's illegal conduct *materially contributed* to his injury." *Affiliated Capital Corporation v. City of Houston*, 735 F.2d 1555, 1564 (5th Cir.1984) (emphasis added). The plaintiffs here produced a substantial quantum of evidence that they suffered lost sales and profits as a result of their competitors' lower retail prices which were occasioned by the unlawful price discrimination. That proof was more than enough to establish the connection between their injury and the defendant's violation of the Act.

There can be little question that the plaintiffs' injuries are of the type "the antitrust laws were designed to prevent." *J.*

6. The term "Dompier-supplied retail stations" includes any stations supplied by Dompier, including Dompier's own retail outlets.

**40**

*Truett Payne Co. v. Chrysler Motors Corp.,* 451 U.S. at 562, 101 S.Ct. at 1927. As is often repeated: "[t]he antitrust laws ... were enacted for 'the protection of *competition* not *competitors*'." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. at 488, 97 S.Ct. at 697 *quoting Brown Shoe Co. v. United States,* 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962). Thus, "the primary purpose of the [Robinson-Patman] Act is to protect the competitive process, not individual competitors." *Black Gold, Ltd. v. Rockwool Industries, Inc.,* 729 F.2d 676, 680 (10th Cir. 1984). The injuries suffered by these plaintiffs were their lost sales and profits brought about by their inability to compete with the favored purchasers' customers, the very "injury the Robinson-Patman Act was intended to prevent." *World of Sleep, Inc. v. La-Z-Boy,* 756 F.2d 1467, 1480 (10th Cir.1985). Clearly, as here, when twelve independent businesses operating in the same general market are unable to compete due to price discrimination, the competitive process, *i.e.* competition, has indeed been injured.

### 4. *Meeting Competition:*

To overcome its burden to establish the "meeting competition" defense, Texaco was required:

> ... at least to show the existence of facts that would lead a reasonable person to believe that the seller's lower price would meet the equally low price of a competitor; it also requires the seller to demonstrate that its lower price was a good faith response to a competitor's lower price.

*Falls City Industries, Inc. v. Vanco Beverage, Inc.,* 460 U.S. at 451, 103 S.Ct. at 1297. Obviously, that standard is a factual one and whether it is met depends " 'on the facts and circumstances of the particular case, not abstract theories or remote conjectures.' " *United States v. United States Gypsum Co.,* 438 U.S. 422, 454, 98

S.Ct. 2864, 2882, 57 L.Ed.2d 854 (1978) *quoting Continental Baking Co.,* 63 F.T.C. 2071, 2163 (1963). Although Texaco did present some evidence in support of its meeting competition defense, that evidence was controverted.[7] Apparently, the jury concluded Texaco did not overcome its burden, and this court is unable to conclude that the meeting competition evidence demanded a contrary result or that the jury's verdict is unsupported by substantial evidence.

### B. *New Trial:*

This court is empowered to grant a new trial "for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." Fed.R.Civ.P. 59(a). Reasons warranting a new trial are if the jury's verdict was "clearly contrary to the weight of the evidence," *William Inglis v. ITT Continental Baking Co.,* 668 F.2d 1014, 1027 (9th Cir.1981), "fundamentally unfair," *Alma v. Manufacturers Hanover Trust Co.,* 684 F.2d 622, 625 (9th Cir.1982), or was a "miscarriage of justice." *Peacock v. Board of Regents,* 597 F.2d 163, 165 (9th Cir.1979). In making the determination as to whether any such reason exists, the court must exercise its "sound discretion." *Philippine National Oil Co. v. Garrett Corp.,* 724 F.2d 803, 805 (9th Cir.1984). In so doing, the court "may properly consider the credibility of the witnesses and the weight of the evidence." *Fount-Wip, Inc. v. Reddi-Wip, Inc.,* 568 F.2d 1296, 1302 (9th Cir.1978). Applying those principles to the new trial grounds asserted by Texaco, the court concludes a new trial is not warranted.

### 1. *Damages:*

■■■■ It is now settled that a plaintiff seeking damages for violation of the Act may not simply look to the amount of discrimination as the measurement of those

---

**7.** Although Texaco did put forth some evidence that its pricing practices in the early 1970's (particularly as regards Gull) were motivated by competition, scant evidence was produced that

the "competitive circumstances" justified a continuation of the lower price in subsequent years. *See Falls City Industries v. Vanco Beverage, Inc.,* 460 U.S. at 450, 103 S.Ct. at 1297.

damages. *J. Truett Payne Co., Inc. v. Chrysler Motors Corp.*, 451 U.S. 557, 101 S.Ct. 1923, 75 L.Ed.2d 174 (1981). The compensable harm is the economic harm suffered as the result of the discrimination and the amount of the discrimination, without more, "does not indicate the amount of lost sales or profits." *Chrysler Credit Corp. v. J. Truett Payne Co., Inc.*, 670 F.2d 575, 582 (5th Cir.1982). But, once a plaintiff has proven an "antitrust injury," a lesser burden is faced in quantifying the damages. *See J. Truett Payne Co., Inc. v. Chrysler Motors Corp.*, 451 U.S. at 565–67, 101 S.Ct. at 1929–30; *Pierce v. Ramsey Winch Co.*, 753 F.2d 416, 435 (5th Cir.1985) ("Under this relaxed burden, a jury verdict may stand on less evidence than is normally required to support a damage award in civil cases"); *Aspen Highlands Skiing Corp. v. Aspen Skiing Co.*, 738 F.2d 1509, 1525 (10th Cir.1984) (relaxed standard is justified because "an antitrust plaintiff is rarely able to prove its damages with mathematical precision"); ABA Antitrust Section, *Antitrust Law Developments*, 409 (1984) ("the burden of proving the amount of damages is less than that required for proving the fact of damage"). Nevertheless, the plaintiff must put forth substantial evidence from which the trier of fact can determine the amount of damages from "a just and reasonable estimate of the damage based upon relevant data." *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264, 66 S.Ct. 574, 580, 90 L.Ed. 652 (1946). That estimate, however, may not be the result of "speculation or conjecture." *Id.*

■ Texaco argues that much of plaintiff's damage evidence is irrelevant. Specifically, the defendant asserts that any damage estimate based upon a hypothetical lower price to plaintiffs is improper. The basis for Texaco's contention is that a damage estimate based on lowering plaintiffs' purchase price assumes that the price was unlawfully high, *i.e.*, that plaintiffs were "overcharged." According to Texaco, the Robinson-Patman Act is not concerned with whether the plaintiffs paid too much for their gasoline but whether their competitors paid too little. Put another way, the defendant categorizes the Act as proscribing "undercharges" not "overcharges."

In the context of Robinson-Patman Act cases, the undercharge-overcharge theory apparently had its genesis in *Enterprise Industries v. Texas Company*, 240 F.2d 457 (2nd Cir.1957), *cert. denied*, 353 U.S. 965, 77 S.Ct. 1049, 1 L.Ed.2d 914 (1957). In *Enterprise*, Judge Learned Hand rejected the notion that a Robinson-Patman Act violation would automatically lead to damages in the amount of the price discrimination. *Id.* at 458–60. Since "the wrong was in selling gasoline to the nine Texaco competitors at a *lower price* than to the plaintiff," *id.* at 458 (emphasis added), Judge Hand concluded that the question of damages (the existence and amount thereof) must focus on the consequences of the *lower price*, not merely the price differential.

Although the Ninth Circuit rejected Judge Hand's approach, *Fowler Manufacturing Co. v. Gorlick*, 415 F.2d 1248 (9th Cir.1969), *cert. denied*, 396 U.S. 1012, 90 S.Ct. 571, 24 L.Ed.2d 503 (1970), at least one distinguished commentator wholeheartedly endorsed it and advocated its universal acceptance. Handler, *The Shift From Substantive to Procedural Innovations in Antitrust Suits—The Twenty-Third Antitrust Review*, 71 Colum.L.Rev. 1, 31–35 (1971) (hereinafter cited as Handler, *Twenty-Third Review*). As then-Professor Handler put it:

Those who adopt an automatic damages rule view the plaintiff's injury as in the nature of an overcharge. According to them, he has paid more than he should lawfully have paid and, accordingly, should recover as damages the amount of the unlawful exaction. After all, one who is victimized by a price-fixing conspiracy may recover the full amount of the overcharge without regard to any possible recoupment (or pass-on) by raising his resale prices. Why should the victim of a discriminatory overcharge fare worse?

The answer is that the Robinson-Patman plaintiff, unlike the purchaser of price-

42

fixed goods, has not been overcharged at all. Had there been no violation of law, he would not necessarily have paid a lower price. The seller would have been free of any and all liability if he had charged others the same high price obtained from the plaintiff. In sum, the plaintiff is not entitled to a lower price, but only to parity with his competitor. That being so, his damages are not to be measured as though he were overcharged. Rather, to demonstrate that he was injured by the price differential, he must show damages flowing from the *under*charge to his competitor.

*Id.* at 32.

Following the Court's decision in *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977) (private plaintiff must demonstrate "antitrust injury"), Milton Handler again attacked the Robinson-Patman Act automatic damages concept:

*Brunswick* thus served to reaffirm *Enterprise*'s basic teaching: that cognizable injury to a section 2(a) case is to be traced not to the higher price paid by the plaintiff (the overcharge)—since the infraction is a price *difference* and all the law requires of the seller is a parity in pricing—but rather to the *undercharge* to plaintiff's competitor. Justice Cardozo, with characteristic feliticy, put it this way in a different, but related, context: "The question is not how much better off the complainant would be today if it had paid a lower rate. The question is how much worse off it is because others have paid less." Put in *Brunswick*'s terms, the fact that the disfavored purchaser pays more for the same product than the favored purchaser, while constituting a form of economic injury or harm to plaintiff's pocketbook, does not amount to "antitrust injury" or provide a proper measure of antitrust damages. On the other hand, "antitrust injury" is sustained where it can be shown that the favored competitor, by virtue of his lower cost, lowered his resale price so that the plaintiff either lost sales volume (if he did not meet this competition) or lost

profits (if he did match the lower resale price). It is the harm from the discrimination, that is, the undercharge and not from the overcharge which constitutes antitrust injury in the *Brunswick* sense.

Handler, *Changing Trends in Antitrust Doctrines: An Unprecedented Supreme Court Term—1977*, 77 Colum.L.Rev. 979, 993 (1977). As we all now know, Handler's insight proved to be in tune with the Court's thinking as evidenced by *Truett Payne*'s rejection of the automatic damage rule.

When the *Truett Payne* Court struck down the concept of automatic damages, in effect it did two things. First, it established that a disfavored buyer must prove it suffered an antitrust injury beyond merely having paid more for a product than the favored buyer; in other words, it may not look to the price differential as constituting the antitrust injury. Second, once the antitrust injury has been proven, it may not simply be measured by the amount of the price differential. The plaintiffs here have not violated either of those prohibitions. Here, the plaintiffs did not rely on the price differential to establish their antitrust injuries: their injuries were proven via evidence of diverted sales and lost profits causally connected to their competitors' *lower prices*, i.e., from the "undercharge." *See* Handler, *Changing Trends in Antitrust Doctrines: An Unprecedented Supreme Court Term—1977*, 77 Colum.L. Rev. at 993. Moreover, the plaintiffs did not merely look to the amount of the price differential to quantify their damages; rather, they presented "just and reasonable" estimates of their lost sales and profits. *See Bigelow v. RKO Radio Pictures*, 327 U.S. at 264, 66 S.Ct. at 579.

The rejection of the automatic damage concept must be distinguished from the way in which plaintiffs used their higher purchase price to estimate their damages. When a disfavored buyer sues for damages for a violation of the Act, "he should as a matter of standard remedial principles, be entitled to be placed in the same position he would have been in had there been no

violation." Handler, *Twenty-Third Review* at 32. But, as the Court recognized in *Truett Payne,* "[t]he vagaries of the market place usually deny us sure knowledge of what plaintiff's situation would have been in the absence of defendant's antitrust violation." 451 U.S. at 566, 101 S.Ct. at 1929. In an attempt to present a picture as to what their sales and profits would have been "had there been no violation," the plaintiffs offered six different hypothetical scenarios in which there was no price discrimination. In four of those hypothetical models, the price differential between the plaintiffs and the favored purchasers was eliminated (either totally or partially) by reducing the plaintiffs' purchase price. By including a reduction-in-price-to-plaintiffs component in their model the plaintiffs are not contending that they were "overcharged"; rather, they have, in effect, postulated how Texaco would have responded had it been ordered to eliminate the price differential. Then the damage estimates for each model represent the difference between the plaintiffs' actual sales and profits and what their sales and profits would have been had Texaco responded as postulated in the model. It is a distortion and misapplication of the "overcharge-undercharge" concept for the defendant to argue that the *only* legally permissible model from which to estimate damages is one in which the favored buyer's price is increased.[8]

The plaintiffs' damage estimates are not based upon "speculation or conjecture." *See Bigelow v. RKO Radio Pictures,* 327 U.S. at 264, 66 S.Ct. at 579. At the core of plaintiffs' expert Dr. Leffler's damage calculations are his conclusions as to the correlations between the at-issue price differentials and plaintiffs' gasoline sales. To establish that correlation Dr. Leffler analysed 1975–1978 price and sales data from some of the plaintiffs' stations and Dompier stations. From that data Dr. Leffler discovered a relationship between plaintiffs' gasoline sales and plaintiffs' retail prices vis a vis Dompier's retail prices. That relationship became the basis of Dr. Leffler's damage computations throughout the entire 1972–1981 period. Although defendant's experts Dr. Barron attacked Dr. Leffler's methods and assumptions, this court is unable to conclude that Dr. Leffler's analysis is improper as a matter of law or that it is too conjectural. Furthermore, the jury apparently accepted a significant portion of Dr. Leffler's analysis, and this court concludes their verdicts were not contrary to the weight of the evidence. None of the verdicts was excessive and each "could reasonably have been reached," and, therefore, should be accepted. *Raynor Brothers v. Cyanamid Co.,* 695 F.2d 382, 385 (9th Cir.1982).

### 2. *Admission of Exhibit 912:*

■ An evidentiary ruling is grounds for a new trial only if refusal to grant a new trial would be "inconsistent with substantial justice." Fed.R.Civ.P. 61. Texaco argues that the court erred in admitting Exhibit 912 because it represents automatic damages in the amount of the price discrimination. While the relevance or probative value of such evidence is unclear since the Court's decision in *J. Truett Payne,* the danger of its admission, *i.e.* that the jury would automatically award damages based

---

**8.** The fallacy of defendant's off-target argument is high-lighted in the following hypothetical: Jack's Texaco and Jenny's Texaco are competing Texaco gasoline retailers in Free Marketville, U.S.A. They both are supplied by Texaco's tanker truck and their product-purchase price is identical and provides Texaco with a better than average profit margin. Being the only Texaco retailers in the market they have prospered and so has Texaco. Now, along come two new Texaco retailers into the market, Tom's Texaco and Terry's Texaco. They receive their gasoline in the same manner as Jake and Jenny, only Tom and Terry pay four cents per gallon more for their gas. Assuming that Tom and Terry eventually close their doors because they cannot compete, that they are able to prove a violation of the Act, that Texaco has no statutory defenses and that the plaintiffs prove "antitrust injury," under Texaco's argument the *only* way to remedy the violation would be to *increase* Jake and Jenny's purchase price. Surely, Tom and Terry are not foreclosed from calculating their damages based on the estimated profits they would have experienced had the price differential been eliminated by lowering their purchase price.

upon the amount of discrimination, was alleviated by the court's oral admonitions and instructions to the jury. *See e.g.*, Ct. Rec. 721 at Instruction No. 28. Thus, it does not appear that the admission of Exhibit 912 "caused substantial harm" to Texaco and, consequently, a new trial is not warranted. *Malhiot v. Southern California Retail Clerks Union*, 735 F.2d 1133, 1137 (9th Cir.1984).

3. *Jury's Questions:*

■ At the beginning of the second day of deliberations, the jury transmitted the following written questions to the court:

Are we to conclude that the self-service gas stations coming into Spokane had nothing to do with loss of gallons to the plaintiff?

Is the issue *only* that Dompier and Gull were sold gas cheaper?

Had the court answered either of those questions in the negative (as requested by Texaco) the court would have improperly assumed the role of fact-finder and/or advocate. The first question clearly raises a factual issue: the cause(s) of plaintiffs lost sales was the subject of considerable evidence and argument during the trial. Similarly, had the court answered "no" to the second question, the court would have been, in essence, repeating a portion of defendant's closing argument. The answers to both inquiries rested exclusively within the province of the jury and the court's response kept them there.

Accordingly, the defendant has not set forth sufficient grounds to entitle it to a new trial.[9] The jury's verdicts are neither "contrary to the weight of the evidence," "fundamentally unfair" or "a miscarriage of justice." The verdicts are a reasonable resolution of a difficult case.

IT IS SO ORDERED. The Clerk is directed to enter this Order and forward copies to counsel.

9. In addition to the new-trial grounds discussed above, the defendant asserts other grounds. Besides restating its four JNOV grounds as grounds for a new trial, Texaco also argues it is entitled to a new trial due to erroneous instructions. As regards the erroneous instructions

ground, Texaco's "overcharge-undercharge," "actual injury to competition" and "proximate cause" arguments have been addressed. The defendant simply has not met either the JNOV standard or established adequate grounds for a new trial.