OPINION OF THE COURT
Charles Edward Ramos, J.
Motion sequences Nos. 003, 004, and 006 are consolidated for purposes of disposition.
In this purported antitrust class action commenced on behalf of smokers, defendants, Philip Morris Companies, Inc., Philip Morris Incorporated (Philip Morris), R.J.R. Nabisco Holdings Corp., R.J. Reynolds Tobacco Co. (RJR), B.A.T. Industries, PLC, British American Tobacco Co., Ltd. (BAT), Batus Holdings, Inc., Brown & Williamson Tobacco Corp., Lorillard Tobacco, Inc., Loews Corporation, Liggett Group, Inc., and Brooke Group, Ltd. (defendants), move to dismiss, pursuant to CPLR 3211 (a) (5) and (7), on the ground that CPLR 901 (b) prohibits an action, such as this, seeking treble damages.
Plaintiffs, Virginia Lennon, Joseph Nierman, and Dorothy Sylvester, claim that defendants have violated General Business Law § 340 (6), commonly referred to as the Donnelly Act *579 (the Act), by engaging in price fixing and other anticompetitive activities. They sue on behalf of all those who had purchased cigarettes in New York indirectly from the defendants, and their affiliates and subsidiaries, from November 1, 1993 to the present.
The facts alleged in the complaint are unchallenged by defendants, and therefore, are presumed to be true, as this court must for the purpose of these motions (Leon v Martinez, 84 NY2d 83 [1994] [concluding that allegations in the complaint are assumed to be true and the complaint is to be construed in the nonmoving party’s favor when deciding a motion under CPLR 3211]; Matter of Colt Indus. Shareholder Litig., 155 AD2d 154 [1st Dept 1990] [finding that any error, if there is to be one, should be made in favor of allowing class action treatment]).
During much of the 20th century, the United States cigarette industry has been dominated by four to six major firms. Five major firms produce more than 99% of cigarettes sold in the United States. According to the complaint, those firms and their approximate shares of the United States cigarette market as of 1998 were: Philip Morris, Inc., 52.68%; R.J. Reynolds Tobacco Company, 24%; Brown & Williamson Tobacco Corporation, the United States subsidiary of British American Tobacco Industries of Britain, 16%; Lorillard, Inc., 6.2%; and Liggett Group, Inc., 1.1%. Plaintiffs contend that the United States tobacco market has annual revenues of approximately $45 billion.
According to the complaint, between 1950 and 1980, price competition was completely absent from the United States cigarette market. Quoting from a United States Supreme Court decision, plaintiff alleges that in 1993, “[t]he [pre-1980’s] cigarette industry * * * has long been one of America’s most profitable, in part because for many years there was no significant price competition among the rival firms * * * List prices for cigarettes increased in lockstep twice a year, for a number of years, irrespective of the rate of inflation, changes in the costs of production, or shifts in consumer demand.” (Quoting Brooke Group v Brown & Williamson Tobacco Corp., 509 US 209, 213 [1993].)
Plaintiffs contend that lockstep pricing practices continued. On March 7, 1997, in response to the proposed $368 billion tobacco/health-care settlement, RJR announced that the prices of its cigarettes would increase by 4 to 5 cents per pack. Shortly thereafter, Philip Morris announced an even higher price *580 increase. The other defendants, including RJR, followed suit, matching the Philip Morris price increase.
Between July 1997 and November 1998, the defendants entered settlements with individual states regarding healthcare lawsuits brought by the states. After each settlement, each of the defendants raised the prices of their cigarettes by the identical amount even though these price increases exceeded the amount necessary to cover the costs of each particular settlement.
On November 18, 1998, Philip Morris and RJR announced, just moments apart, that each company would increase the prices for all their cigarette brands by a record 45 cents per pack. The other defendants raised their prices to match this increase shortly thereafter.*
Then, on August 27, 1999, Philip Morris announced that it would raise prices on its cigarette products by 18 cents per pack in order to cover the upcoming 10 cents per pack increase in federal excise taxes. The other defendants immediately followed suit, matching Philip Morris’ price increase for their products.
On January 14, 2000, Philip Morris and RJR again announced that they would both increase prices by 13 cents per pack. Again, the other defendants immediately followed suit and raised their prices by the same amount.
Meanwhile, the defendants maintain information in an electronic data base in Pittsburgh that reports the discounts and product promotions for all the products of other defendant competitors. According to the complaint, defendants all have access to the data base which they allegedly use to monitor cigarette prices.
Plaintiffs contend that defendants’ cigarette prices have been set significantly above competitive levels, despite the fact that, according to plaintiffs, cigarette demand has declined in the United States and defendants have experienced excess ciga *581 rette manufacturing capacity. Plaintiffs also allege that during the class period, the defendants have had an expressed policy that cigarette prices were to be increased at a rate exceeding inflation.
Without describing the factual underpinning of plaintiffs’ claims, plaintiffs allege that in acting on their agreement, defendants met to discuss and agree upon future price increases, and shared actual transactional prices. The effects of their activities were to maintain the price of cigarettes at artificially high levels. They contend that defendants’ activities lessen price competition and deprived plaintiffs of the benefit of free and open competition, in violation of the Donnelly Act. Based upon these facts, the complaint also asserts that defendants have violated General Business Law § 349 which prohibits unfair and deceptive business practices.
Defendants seek dismissal of the complaint on the ground that plaintiffs seek treble damages under the Donnelly Act, which they contend are punitive in nature, and as such, disallows use of the class action statute under CPLR 901 (b). Defendants also argue that the provision of the Donnelly Act which affords a right of action to indirect purchasers has no retroactive effect, the acts complained of occurred prior to its enactment, and those activities that postdate the 1998 amendment of the Act are insufficient to state a claim.
The Donnelly Act declares illegal and against public policy any agreement or monopoly in the conduct of any business or trade whereby “[Competition or the free exercise of any activity in the conduct of any business * * * [is] retrained” (General Business Law § 340 [1]). Violation of the Act permits those who sustain damages to recover treble damages along with costs and attorneys’ fees (General Business Law § 340 [5]). Until 1998, the law allowed only direct purchasers to sue for violation of the antitrust laws. General Business Law § 340 (6) extends to indirect purchasers or “any political subdivision or public authority of the state, or any person who has sustained damages by reason of violation of [General Business Law § 340],” the right to maintain an action to recover damages. Although General Business Law § 340 (6) gives indirect purchasers, typically end users or consumers of products and services, a right of action, CPLR 901 (b) provides that “[u]nless a statute creating or imposing a penalty, or a minimum measure of recovery specifically authorizes the recovery thereof in a class action, an action to recover a penalty, or minimum measure of recovery created or imposed by statute may not be maintained *582 as a class action.” Therefore, if treble damages are found to penalize those who violate the Donnelly Act, then CPLR 901 (b) bars class recoveries in the absence of statutory language which authorizes class action claims.
A long line of federal cases clearly supports plaintiffs’ contention that treble damages under the Sherman Act and the Clayton Act are remedial, not punitive, in nature (Brunswick Corp. v Pueblo Bowl-O-Mat, 429 US 477 [1977]; see also, Blue Shield v McCready, 457 US 465 [1982]; Mitsubishi Motors Corp. v Soler Chrysler-Plymouth, 473 US 614 [1985]; see also, Payne Co. v Chrysler Motors Corp., 451 US 557 [1981]). The United States Supreme Court has held that treble damages are designed primarily to serve a remedial function (Brunswick Corp. v Pueblo Bowl-O-Mat, supra). In Mitsubishi Motors v Soler Chrysler-Plymouth (supra, at 635) the Supreme Court held that “the private cause of action plays a central role in enforcing” the federal antitrust laws. It quoted the United States Court of Appeals decision in the earlier Mitsubishi Motors matter, saying that “ ‘[a] claim under the antitrust laws is not merely a private matter. The Sherman Act is designed to promote the national interest in a competitive economy; thus, the plaintiff asserting his rights under the Act has been likened to a private attorney-general who protects the public’s interest’ ” (quoting Mitsubishi Motors v Soler Chrysler-Plymouth, 723 F2d 155, 168 [1st Cir 1983]). The Supreme Court further stated that “[t]he treble-damages provision wielded by the private litigant is a chief tool in the antitrust enforcement schemes, posing a crucial deterrent to potential violators.” (473 US at 635.) While recognizing it as an effective tool against violations of the statute, the Court also acknowledged that treble damages are primarily to enable an injured competitor to gain compensation for that injury. Citing Brunswick and the legislative history of the Sherman Act, the Supreme Court stated (at 636) that “the treble-damages provision ‘was conceived of primarily as a remedy for “[t]he people of the United States as individuals,” ’ 429 U. S., at 486, n. 10 * * * quoting 21 Cong. Rec. 1767-1768 (1890) (remarks of Sen. George); when reenacted in 1914 as § 4 of the Clayton Act, 38 Stat. 731, it was still ‘conceived primarily as “opening] the door of justice to every man, whenever he may be injured by those who violate the antitrust laws, and giv[ing] the injured party ample damages for the wrong suffered.” ’ 429 U. S., at 486, n. 10 * * * quoting 51 Cong. Rec. 9073 (1914) (remarks of Rep. Webb).”
*583 New York’s General Business Law § 340 is intended to further this protection to citizens of New York State (see, State of New York v Mobil Oil Corp., 38 NY2d 460, 464 [1976]). The Donnelly Act is often referred to as the “Little Sherman Act” (Anheuser-Busch, Inc. v Abrams, 71 NY2d 327, 335 [1988]). The Court of Appeals has held that since the Donnelly Act is modeled after the Sherman Act of 1890, the Act should generally be construed in light of federal precedent, and given different interpretation only where state policy and differences in statutory language justify such deviation (X.L.O. Concrete Corp. v Rivergate Corp., 83 NY2d 513 [1994]; see also, Anheuser-Busch, Inc. v Abrams, 71 NY2d 327 [1988]).
A fundamental defect in plaintiffs’ argument, however, is that the federal and state antitrust statutes differ when read in light of their statutes’ class action counterpart. Although federal courts have held that treble damages are remedial, not punitive, New York state courts have historically concluded that treble damages are punitive in nature (Fults v Munro, 202 NY 34, 41 [1911]; Potter v Bierwirth, 171 App Div 175 [1916]; Lyke v Anderson, 147 AD2d 18, 28 [2d Dept 1989]; Rental & Mgt. Assocs. v Hartford Ins. Co., 206 AD2d 288 [1st Dept 1994]; Hoffman v Ryan, 101 Misc 2d 845 [Sup Ct, NY County 1979]; Roxbury Light & Power Co. v Dimmick, 196 NYS 320 [Sup Ct, NY County 1922]; see also, Rubin v Nine W. Group, 1999 WL 1425364, 1999 NY Misc LEXIS 655 [Sup Ct, Westchester County, Nov. 3, 1999, DiBlasi, J.]; Blumenthal v American Socy. of Travel Agents, 1977 WL 18392, *3 [Sup Ct, NY County, July 5, 1977, Fein, J.] [finding the Donnelly Act “imposes a penalty” — “treble damages (are) the minimum damages” and that “(t)he statute is mandatory”]). On this basis, several New York courts have disallowed class actions for treble damages under the Donnelly Act (Rubin v Nine W. Group, supra; Blumenthal v American Socy., supra; Russo & Dubin v Allied Maintenance Corp., 95 Misc 2d 344 [Sup Ct, NY County 1978]; Cox v Microsoft, No. 1051931/2000, Sup Ct, NY County, Nov. 2000; Asher v Abbott Labs., No. 123431/1999, Sup Ct, NY County, Oct. 2000). Although the case law may not be controlling, this court finds that a compelling argument exists for reaching a similar finding.
Federal case law upon which plaintiffs rely is inapposite, because it does not contemplate, and therefore, fails to demonstrate, how a treble damages class action can bypass CPLR 901 (b)’s prohibition. Class action Federal Rules of Civil Procedure rule 23 has no such similar prohibition. Contrary to *584 plaintiffs’ contention that federal precedent applies, here, this court is bound to give effect to a state policy where state law deviates from the federal statute (Anheuser-Busch, Inc. v Abrams, supra, 71 NY2d at 335). As previously stated, historically, treble damages have been found punitive in nature, particularly where the claim is commenced as a class. Apparently, CPLR 901 (b) was “designed to discourage * * * recovery of a statutory minimum by each class member [that] results in ‘annihilatory punishment.’ ” (McLaughlin, Practice Commentaries, McKinney’s Cons Laws of NY, Book 7B, CPLR C901:7, at 327-328, citing Vickers v Home Fed. Sav. & Loan Assn., 87 Misc 2d 880.) Undoubtedly, a class action for treble damages will have a punitive effect on any defendant. Even where treble damages are discretionary and need not be sought by the injured party, it is this court’s understanding that no New York court has sustained such a claim either under the Donnelly Act or any other statutory provision. No direct purchaser has been apparently permitted to maintain a class claim. Although, a more realistic and accurate view of the antitrust laws is that they perform both remedial and policing functions, New York’s class action procedures and the prevailing interpretation of the word “penalty” require that plaintiffs identify express authorizing language (cf., Carter v Frito-Lay, Inc., 74 AD2d 550, 551 [1st Dept 1980]), or otherwise be barred from maintaining this claim.
The Donnelly Act is silent on whether class actions can be commenced by indirect purchasers. Plaintiffs rely on transcripts from the May 1998 Assembly floor debate regarding the amendment to section 340, adding subdivision (6) to that provision. These transcripts show an exchange between Assemblyman Straniere and Assemblyman Brodsky, the sponsor of the amendment in the Assembly, where Brodsky informs the Assembly that this amendment is intended to allow for class action suits brought under the Act (Assembly debate transcripts, May 26, 1998, at 34). Plaintiffs also submit an excerpt from a letter addressed to Governor Pataki and written by the Business Council of New York State, an opponent of the amendment, which stated that the amendment “simply provides an additional and unnecessary avenue for the litigation of consumer class actions.” (Letter to Honorable James McGuire, Counsel to Governor, Nov. 18, 1998, Bill Jacket, L 1998, ch 653.) The excerpts from the floor debate and the letter in opposition may indicate that the Legislature intended to allow class actions by indirect purchasers. However, the rules of *585 statutory construction clearly preclude this court from reaching the provision’s legislative history when, as in this case, the language is unambiguously silent; there is no language for this court to construe (Matter of Raritan Dev. Corp. v Silva, 91 NY2d 98, 106-107 [1997]).
Indirect purchasers have been afforded essentially a right of action which is hollow in effect, despite the purpose of General Business Law § 340 (6) and what the Legislature may have intended. The most prevalent indirect purchaser, the consumer, will have little incentive to pursue protracted antitrust litigation when the loss at stake is their own personal loss. Nor will individual consumers have the resources to sustain a claim against defendants such as the tobacco manufacturers. Without the class action procedure, indirect purchasers are unlikely to utilize General Business Law § 340 (6).
Further, this court believes that class actions are the only means of avoiding multiple liability for the same harm and to ensure indirect purchasers have full benefit of the right to sue for antitrust violation. Then “[c]oordination of recovery for all those affected by price fixing might be achieved by * * * embracing all direct and indirect purchasers, with damages to be allocated” accordingly (Givens, Supp Practice Commentaries, McKinney’s Cons Laws of NY, Book 19, General Business Law § 340, 2001 Pocket Part, at 209). While this reasoning clearly favors permitting a class claim, this court cannot ignore that since enacting the Donnelly Act, the New York State Legislature has twice considered the indirect purchaser’s right to bring suit. Yet, no express languages in the statute, as required by CPLR 901 (b), has been adopted which authorizes the maintenance of a class action. Omissions in a statute cannot be supplied by construction (see, McKinney’s Cons Laws of NY, Book 1, Statutes § 363; Matter of Kessel v Dodd, 46 AD2d 645 [2d Dept 1974]), and where the statute is clear and complete as written, the judiciary cannot rewrite the law (McKinney’s Cons Laws of NY, Book 1, Statutes § 94). This court is constrained to find that in the absence of any legal authority, CPLR 901 (b) prohibits this class action claim.
Even assuming legal authority supports an antitrust class action claim, plaintiffs’ allegations are limited to those events which occurred within the applicable four-year statute of limitation under General Business Law § 340 (5). Where a statute instructs that it is “to take effect immediately,” then it is interpreted not to have a retroactive operation or effect (Murphy v Board of Educ., 104 AD2d 796 [2d Dept 1984], referring *586 to McKinney’s Cons Laws of NY, Book 1, Statutes § 51). However, remedial legislation or statutes governing procedural matters should be applied retroactively (Majewski v Broadalbin-Perth Cent. School Dist., 91 NY2d 577, 584 [1998]).
Here, the Act states that the amendment’s provisions are “to take effect immediately.” (General Business Law § 340 [6], L 1998, ch 653, § 1.) The defendants claim that statutory amendments will have no retroactive application unless the language of the statute clearly indicates that it shall receive contrary interpretation. Section 340 (6) includes no such provision (McKinney’s Cons Laws of NY, Book 1, Statutes § 52). In Majewski, the Court found that a remedial statute, for statute of limitation purposes, is one which creates no new right of action or increases a defendant’s exposure to liability. Because General Business Law § 340 (6) adds a claim that would not otherwise exist, the amendment is not remedial in effect. Moreover, courts interpreting provisions of the General Business Law have rejected retroactive application of amendments creating new private rights of action (see, Burns v Volkswagen of Am., 118 Misc 2d 289 [Sup Ct, Monroe County 1982], affd 97 AD2d 977 [4th Dept 1983]; Copeland v Schwartz Moving & Stor. Corp., 126 Misc 2d 744 [Civ Ct, NY County 1985]; Sabater v Lead Indus. Assn., 183 Misc 2d 759 [Sup Ct, Bronx County 2000]). Therefore, the statute of limitation cannot be retroactively applied.
Without allegations of events that postdate the 1998 amendment, the plaintiffs’ complaint fails to sufficiently state a claim. To state a claim, plaintiffs must allege the making of an agreement to fix prices, the terms of that agreement, and specific acts committed in furtherance of the agreement (State of New York v Milk Handlers & Processors Assn., 28 AD2d 971 [1st Dept 1967]). Plaintiffs’ conclusory statements that throughout the period in question, defendants, through their officers, directors, employees and agents, met to discuss price increases are not enough to demonstrate the existence of a conspiratorial agreement (Battipaglia v New York State Liq. Auth., 745 F2d 166, 174-175 [2d Cir 1984]). Also, the defendants’ maintenance of an electronic data base which enabled each defendant to monitor and match their competitors’ prices is not proof of anticompetitive activity (id.). Nor are facts showing defendants engaged in parallel pricing adequate to bolster plaintiffs’ claims (Blomkest Fertilizer v Potash Corp., 203 F3d 1028 [8th Cir 2000], cert denied 531 US 815 [2000]). Parallel price increases, attendance at industry meetings, and the existence of a data *587 base, standing alone, are not sufficient to state a claim of conspiracy.
Because plaintiffs fail to oppose defendants’ motion to dismiss their claims under General Business Law § 349, that claim must also be dismissed.
Accordingly, it is ordered that defendants’ motion is granted and the complaint is dismissed in its entirety.

 Although not relevant here, if plaintiifs’ allegations are true, it would appear that the multi-billion dollar National Tobacco Litigation Settlement (which this court did not approve) was a brilliant slight-of-hand by the tobacco companies. By taking the additional price per pack for cigarettes from smokers and transferring that money to the settling state governments and the lawyers who represented those governments, as the settlement amount, these defendants have not been paying the settlement out of their own money, they are merely circulating money from smokers to state governments. It would be as if a retailer found to have overcharged his customers was permitted to repay his customers out of future overcharges.