SECURITIES and EXCHANGE COMMISSION, Plaintiff,

v.

ASSET RECOVERY AND MANAGEMENT TRUST, S.A., et al., Defendants.

Civil Action No. 2:02cv1372–T.

United States District Court, M.D. Alabama, Northern Division.

Sept. 24, 2004.

Asita Obeyesekere, Securities & Exchange Commission, Jaun Marcel Marcelino, Securities & Exchange Commission, Martin Francis Healey, Securities & Exchange Commission, Philip C. Koski, Securities & Exchange Commission, Boston, MA, for Plaintiff.

Asset Recovery and Management Trust, S.A., pro se.

Alvin T. Prestwood, Prestwood & Associates PC, Montgomery, AL, Irving Anolik, New York, NY, Robert Bradford Garris, Tara Smelley Knee, Prestwood & Associates PC, Curtis L. (Buddy) Scott, Scott Attorneys LLC, Montgomery, AL, for Defendants.

## ORDER

MYRON H. THOMPSON, District Judge.

Plaintiff Securities and Exchange Commission (SEC) filed this action against defendants Asset Recovery and Management Trust, S.A. (ARM), Frank R. Johnson, Milton Vaughn, and Carlos Fernandez Alfaro, claiming violations of §§ 5(a), 5(c) and 17(a) of the Securities Act of 1933, 15 U.S.C.A. §§ 77e(a), 77e(c) and 77(q), and of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b). On December 18, 2002, United States Magistrate Judge Susan Russ Walker entered an order freezing the assets of all four defendants. Johnson and Vaughn filed two motions: a motion to dissolve the order freezing their assets; and an alternative motion to amend the order so that they are able to provide for their personal expenses and attorneys' fees. Based on the evidence submitted by the parties, including that presented at a hearing, the court concludes that the motions should be denied.

## I. FACTS

Johnson was prosecuted in 1999 for defrauding investors in a scheme involving the International Benevolent Fund Trust (IBFT). Shortly thereafter, IBFT investors received information from Johnson, via mail and voice mail recordings on the IBFT information line, notifying investors that he had arranged for ARM to recover the funds they had lost investing in IBFT. Investors would then receive information from ARM, either from the internet or through the mail, which offered to help IBFT investors recover the funds they had lost and also solicited these same investors to invest in ARM schemes. ARM collected approximately $900,000 from these investors.

ARM was incorporated in the United States by J.W. Williamson; another entity, ARMTrust, was incorporated in Costa Rica by Vaughn and Alfaro. Johnson is the treasurer of ARMTrust and a member of its board of directors; Vaughn acted as its secretary and chairman.

The SEC alleges that the money invested in ARM was transferred into ARM or ARMTrust bank accounts located in Costa Rica. Of the funds in the defendants' own frozen bank accounts, the SEC was able to identify $20,000 which had come from ARM accounts. These funds were transferred from Costa Rica and deposited in the account of AAA Management, a business run by Vaughn. Another approximately $400,000 was transferred from Costa Rica to an American ARMTrust account on which Vaughn was a signatory. Funds from this account were used to pay ARM's phone and fax bills. The account had already been closed, and the funds removed, by the time the SEC learned of these activities. Investors never saw a return on their investments and those investors who requested that their investments be returned, as promised, never received their money or were only repaid nominal amounts.

Johnson and Vaughn contend that all of the alleged fraudulent activity was committed by ARM, an entity separate, distinct, and unrelated to ARMTrust or themselves. They acknowledge that, at one point, Johnson hired ARM to recover IBFT funds, but contend that Johnson later repudiated the relationship. They further maintain that ARMTrust was a holding company established simply to hold "incidental funds" "in the event that something happened," that it had "virtually no activity," and that, "as far as they knew," it had received no ARM funds.

The SEC maintains that ARM and ARMTrust are one and the same entity and offered evidence at the hearing, and in its submissions, demonstrating the interchangeable relationship between the two. The SEC presented evidence that ARM's website and e-mail addresses contained the name "ARMTrust;" that ARM and ARMTrust shared the same mailing address; that Johnson recorded voice messages referring IBFT investors to ARM; that voice messages made by ARMTrust were recorded on behalf of ARM; that investors were asked to make their money orders payable to ARM or ARMTrust; that the defendants were signatories on ARMTrust accounts; that investors' funds were deposited in a Costa Rican bank account and then wired to a now-defunct ARMTrust American account controlled by Vaughn and Alfaro; that Vaughn paid ARM bills from this account; and that ARMTrust sent an e-mail recommending a multi-level marketing scheme to ARM investors.[1] The investors who joined the scheme were credited to Johnson, who received a portion of their money. Finally, the SEC investigator stated that, as far as he could determine, Williamson was a fictitious person.

## II. DISCUSSION

■ The Eleventh Circuit Court of Appeals has held that an asset freeze is generally inappropriate when the purpose is to satisfy a potential judgment for money damages, a legal remedy. *Rosen v. Cascade Int'l, Inc.*, 21 F.3d 1520, 1530 (11th Cir.1994). The appellate court, however, distinguished an asset freeze ordered for the purpose of preserving assets for a legal remedy from one ordered for the purpose of preserving assets for an equitable remedy. *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 987 (11th Cir.1995). The court found that "[a] request for equitable relief invokes the district court's inherent equitable powers to order preliminary relief, including an

---

1. The SEC described the scheme as one in which each person involved enlists others to invest in the scheme. A participant then receives a portion of the money invested by each person he or she recruits, as well as a portion of the money paid by each person the participant's recruit brings to the scheme.

asset freeze, in order to assure the availability of permanent relief." *Id.* Asset freezes may be appropriate in the context of securities cases, as well. The Securities Act of 1933 and the Securities and Exchange Act of 1934 confer general equity powers upon district courts. *Sec. & Exch. Comm'n v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1103 (2d Cir.1972). When there is a showing of a securities law violation, the freezing of assets may be appropriate to ensure that the assets will be available to compensate public investors. *Id.* at 1106.

In the legal-remedy context, asset freezes unrelated to the underlying illegal activity are considered to be attachments. *Rosen*, 21 F.3d at 1530; *Mitsubishi Int'l Corp. v. Cardinal Textile Sales, Inc.*, 14 F.3d 1507, 1521 (11th Cir.1994). Thus, in an action for damages, assets unrelated to the illegal activity may only be frozen as provided by state attachment law, in accordance with Federal Rule of Civil Procedure 64. *Mitsubishi*, 14 F.3d at 1521. Johnson and Vaughn argue that this principle applies in the context of equitable remedies as well. The Eleventh Circuit has yet to address this issue, acknowledging only that "it is not clear that the district court's authority extend[s] to freezing those assets which might not have been available to satisfy an award of profits." *Levi Strauss*, 51 F.3d at 987.

The SEC seeks the asset freeze for the sole purpose of preserving investors' funds for the equitable remedy of disgorgement. While the SEC offered much evidence which tended to show that Vaughn and Johnson were involved with ARM and ARMTrust, it failed to submit evidence which directly linked their frozen assets to the investors' funds. In fact, the SEC was able to directly connect only $20,000 of ARM's money to one of Johnson's accounts, that of AAA Management. The SEC's difficulty in tracing ARM funds

arose from the defendants' use of Costa Rican bank accounts, the records of which the SEC did not have the power to subpoena. The SEC did submit considerable evidence, however, which demonstrated that the Costa Rican bank accounts were purposely used by the defendants as part of their scheme to defraud investors.

Eleventh Circuit case law suggests that the court may freeze those assets that may be disgorged as an equitable remedy at a later time. *Levi Strauss*, 51 F.3d at 987. When it is the defendants' own deliberate scheme to hide investor funds that makes it impossible to ascertain the accounts that should be properly frozen for later disgorgement, however, it is appropriate to freeze those assets where there is a just and reasonable inference they may be linked to the underlying activity. The principle that a wrongdoer may not benefit from his own fraud is well-settled:

"Where the tort itself is of such a nature as to preclude the ascertainment of the amount of damages with certainty, it would be a perversion of fundamental principles of justice to deny all relief to the injured person ... In such case, ... it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate. The wrongdoer is not entitled to complain that they cannot be measured with the exactness and precision that would be possible if the case, which he alone is responsible for making, were otherwise."

*Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563, 51 S.Ct. 248, 250–51, 75 L.Ed. 544 (1931); *see also J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 567, 101 S.Ct. 1923, 1929, 68 L.Ed.2d 442 (1981) (uncertainty in damages was acceptable due to "the principle ... that it does not 'come with very good grace' for the wrongdoer to insist

upon specific and certain proof of the injury which it has itself inflicted'") (citations omitted); *Ramada Inns, Inc. v. Gadsden Motel Co.,* 804 F.2d 1562, 1565 (11th Cir. 1986) ("The wrongdoer may not complain of inexactness where his actions preclude precise computation of the extent of the injury."). This principle is appropriately applied in the context at hand as well.

Here, the SEC entered evidence that the defendants used Costa Rican accounts as part of their scheme. Costa Rican accounts were used to hold investors' funds, despite the fact that the targeted investors were all American. The defendants were well aware of the secrecy Costa Rican banks would provide as evidenced by the fact that they told investors that Costa Rican accounts were necessary to ensure member privacy and security. Furthermore, it is clear that the defendants sought to evade the SEC investigation as they specifically told investors that anyone cooperating with investigators would forfeit their funds and that cooperation was undesirable because it could start an "offshore investigation." While the SEC has made good-faith efforts to trace the whereabouts of investors' funds, the defendants' scheme has made this an extremely difficult task. The SEC has been able to trace funds by subpoenaing records of only American banks tangentially related to ARMTrust's activities. Of the funds traced, the SEC has been able to determine that some money had, in fact, been transferred to Vaughn's company, AAA Management. The SEC was also able to determine that Johnson had personally benefited from ARM investors participating in the multilevel marketing scheme advertised by ARMTrust. Thus, the SEC has shown both that the use of Costa Rican account was part of the defendants' scheme to defraud investors and that some of investors' funds were transferred to the defendants' own accounts.

The SEC's inability to state with more certainty those accounts containing investor funds is a direct result of Johnson and Vaughn's efforts to conceal the whereabouts of the funds. In such a situation, the uncertainty should be borne not by those harmed but by those whose actions created the uncertainty. *Story Parchment,* 282 U.S. at 563–64, 51 S.Ct. at 251. Given the evidence, it is a just and reasonable inference that Johnson and Vaughn's accounts contain some of the investors' funds. Therefore, a freeze of these accounts, up to the amount of loss, $900,000, is appropriate.

Before the court may order that the assets remain frozen, however, it must consider the status of the order freezing the assets. In actions involving asset freezes, the orders freezing the assets are usually temporary restraining orders (TRO) or preliminary injunctions. *See, e.g., Mitsubishi,* 14 F.3d at 1513; *Rosen,* 21 F.3d at 1525. Thus, the court must determine whether the magistrate judge's order freezing assets was a TRO or a preliminary injunction. The Eleventh Circuit has routinely examined TROs and found that they were, in fact, preliminary injunctions. *See, e.g., Levine v. Comcoa Ltd.,* 70 F.3d 1191, 1193 (11th Cir.1995); *Fernandez–Roque v. Smith,* 671 F.2d 426, 429 (11th Cir.1982). In considering whether a court order is a preliminary injunction, the appellate court has considered the order's duration, whether the parties have had notice and a hearing, and whether the order preserves the status quo or, instead, gives the relief requested in the complaint. *Levine,* 70 F.3d at 1193 (treating a TRO as a preliminary injunction is "especially appropriate where, as in this case, there has been notice to the parties, a full hearing ..., and then a stated and clear decision ... to extend the terms of the restraining order indefinitely"); *Fernandez–Roque,* 671 F.2d at 429 ("One inherent characteristic of a temporary restraining order is

that it has the effect of merely preserving the status quo rather than granting most or all of the substantive relief requested"). "The lengthier the duration of the order, and the more stringent the procedural safeguards employed ... the more likely a TRO will be considered a preliminary injunction." *McDougald v. Jenson*, 786 F.2d 1465, 1472 (11th Cir.1986).

The order entered by the magistrate judge in this case is long-standing—it lasts until final judgment—and was entered *ex parte* on the SEC's motion. Furthermore, the order went beyond the status quo, foreclosing the defendants' ability to utilize their property. The duration and nature of relief requested, therefore, weigh in favor of finding the order was a preliminary injunction. Considering, however, that the order was entered *ex parte*, treatment as a TRO might be more appropriate. The Eleventh Circuit has expressly recognized that TROs, entered *ex parte*, "fall of their own weight." *Levine*, 70 F.3d at 1193 n. 7 ("We accept that, where there has been no notice to the parties and no hearing on the various factors involved in considering a preliminary injunction, a TRO continued past the Rule 65 limit falls of its own weight."). The Eleventh Circuit based its recognition on the Supreme Court's holding in *Granny Goose* that "our entire jurisprudence runs counter to the notion of court action taken before reasonable notice and an opportunity to be heard has been granted both sides of a dispute. *Ex parte* TROs ... should be restricted to serving their underlying purpose of preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing, and no longer." *Granny Goose Foods, Inc., v. Bhd. of Teamsters & Auto Drivers Local No. 70*, 415 U.S. 423, 439, 94

S.Ct. 1113, 1124, 39 L.Ed.2d 435 (1974). In this case, while the order freezing assets was substantively a preliminary injunction, the proper procedural steps effectuating its long-term duration were not followed. Thus, despite the magistrate judge's intent to freeze Johnson and Vaughn's assets beyond the ten-day limit contained in Rule 65, the *ex parte* order expired "of its own weight" after ten days. Moreover, the order was a preliminary injunction which was entered without the necessary findings. Therefore, in order for this court to freeze the assets in question, it must make findings warranting a preliminary injunction. *Id.* at 441, 94 S.Ct. at 1125 (when party seeks to make TRO permanent, it "bear[s] the burden of demonstrating the various factors justifying preliminary injunctive relief").

■ Whether to issue a preliminary injunction lies within the sound discretion of the district court. *Frio Ice, S.A. v. Sunfruit, Inc.*, 918 F.2d 154, 159 (11th Cir. 1990). The Eleventh Circuit Court of Appeals has established a four-prong test for the district court to apply when determining whether a preliminary injunction should issue. Under this test, the movant must demonstrate: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction is not granted; (3) the threatened harm to the plaintiff outweighs any harm that the injunction may cause the defendant; and (4) the public interest will not be disserved by the grant of a preliminary injunction. *Id.*

Among other things, the SEC alleges that Vaughn and Johnson defrauded ARM investors in violation of 15 U.S.C.A. § 77q(a), 15 U.S.C.A. § 78j(b) and 17 C.F.R. § 140.10b–5.[2] It submitted convinc-

---

**2.** 15 U.S.C.A. § 77q(a) states that:

"It shall be unlawful for any person in the offer or sale of any securities ... by the use of any means or instruments of transporta-

tion or communication in interstate commerce or by use of the mails, directly or indirectly

ing evidence that ARM and ARMTrust were one and the same entity; that Johnson provided the names of IBFT investors to be targeted by ARM through use of the phone, e-mail, and mail; that investors paid ARM, and funds were transferred to accounts in both Costa Rica and the United States; that the investments advertised did not exist; that despite investors' requests, their money was never returned; that ARM activity traced by the SEC could be linked to Johnson and Vaughn; and that Johnson and Vaughn actively discouraged investors from participating in the investigation of ARM. In sum, the evidence demonstrates that Johnson and Vaughn participated in a scheme whereby previously defrauded investors were induced to give Johnson and Vaughn their money for non-existent investments. Hence, the court finds that there is a substantial likelihood that the SEC will succeed on the merits of its fraud claims.

The court also finds that the SEC has demonstrated a substantial threat of irreparable harm if the injunction is not granted. The SEC has had difficulty in ascertaining the location of investors' funds due to Johnson and Vaughn's purposeful efforts. The absence of an injunction would allow Johnson and Vaughn to further dissipate any equitable remedy available to the defrauded investors, causing investors irreparable harm. Moreover, the threatened harm to the investors outweighs any harm that the injunction may cause John-

son and Vaughn; while Johnson and Vaughn will suffer from their inability to access their resources, they may move the court to modify the order to provide for their living expenses. Finally, the court finds that the public interest will not be disserved by the grant of a preliminary injunction. It is in the public interest to protect against fraud and to make victims of fraud whole, while preventing wrongdoers from benefiting from their deceit. Consequently, the court finds that a preliminary injunction freezing Johnson and Vaughn's assets is appropriate.

## III. CONCLUSION

An asset freeze is appropriate when issued to preserve assets connected to the underlying illegal activity for possible disgorgement at a later time. Where the defendants' own deceptive practices prevent the court from determining the whereabouts of the assets connected to the underlying activity, the court may freeze those assets which it can justly and reasonably infer are related to the underlying illegal activity. The court can reasonably infer that Johnson and Vaughn's assets are related to the underlying illegal activity. Furthermore, while the *ex parte* order freezing assets fell of its own weight after ten days, pursuant to Fed.R.Civ.P. 65, under the four-prong test used to determine the appropriateness of a preliminary injunction, preliminary injunctive relief is warranted in this case.

(1) to employ any device, scheme, or artifice to defraud, or

(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser."

The SEC has alleged § 77q(a)(1)-(3) as a ground for its fraud claims.

15 U.S.C.A. § 78j(b) makes it unlawful for any person to use "manipulative or deceptive device or contrivance in contravention" of 17 C.F.R. § 240.10b–5. The text of 17 C.F.R. 250.10b–5 is largely similar to that of 15 U.S.C.A. § 77q(a).

The court will address only the SEC's fraud claims as it is on these claims that the SEC seeks to preserve Johnson and Vaughn's assets for future disgorgement.

Accordingly, it is the ORDER, JUDG-MENT, and DECREE of the court as follows:

(1) Defendants Frank R. Johnson and Milton Vaughn's motion to dissolve order freezing assets (Doc. no. 16) is denied.

(2) The order entered by United States Magistrate Judge Susan Russ Walker freezing the assets of all four defendants (Doc. no. 8) is continued as a preliminary injunction.

(3) Defendants Johnson and Vaughn's alternative motion to provide for living expenses and attorney's fees is denied because these defendants did not address this issue at the hearing. Defendants Johnson and Vaughn may renew their motion to modify, specifying the desired modifications, if they so desire.

DONE, this the 29th day of September, 2004.